[L. A. No. 1219.   Department Two.—February 11, 1904.]

## J. C. WILSON, Appellant, v. ALCATRAZ ASPHALT COMPANY, Respondent.

CONTRACT TO FURNISH OIL—ACTION FOR PRICE—COUNTERCLAIM—DAMAGE FOR BREACH OF CONTRACT—INSTRUCTION AS TO VERDICT.—Under a contract to furnish oil to the defendant, which was broken by the plaintiff, who has sued to recover the price of oil furnished, the defendant is entitled to counterclaim the extra cost to the defendant of procuring oil from other parties to satisfy the contract, and where such extra cost exceeded the amount sued for, the court properly directed the jury to return a verdict for the defendant for the difference between such extra cost and the price of the oil furnished.

ID.—CONSTRUCTION OF CONTRACT.—The contract, and each and every clause thereof, must be read together, so as to arrive at its true intent and meaning, and where the contract recites that, unless for certain excepted causes, plaintiff shall be unable to supply the oil demanded by the contract, plaintiff shall at all times be required to furnish the same, the contract excludes all other causes by impli-

[1] 12 Am. St. Rep. 113.                    [2] 56 Am. St. Rep. 153.

cation, and the plaintiff must supply the oil required by the contract by the delivery of oil produced by other parties, where such delivery is not stipulated against.

ID.—POSSIBILITY OF PERFORMANCE.—If the performance of a contract is possible and lawful, and there is no impossibility in the nature of the thing to be done, the failure to perform it is none the less a breach, although the obligor himself may become wholly unable to perform; and he must make compensation in damages for such breach, though the performance was rendered impracticable, or even impossible, by some unforeseen cause for which no provision is made and over which he had no control, but against which he might have provided in the contract.

ID.—EVIDENCE—HARMLESS RULING.—The admission of evidence as to certain letters and invoices which were in harmony with the construction put upon the language of the contract by the court, if immaterial, was harmless.

APPEAL from a judgment of the Superior Court of Santa Barbara County. D. K. Trask, Judge presiding.

The facts are stated in the opinion.

J. W. Taggart, for Appellant.

Canfield & Starbuck, for Respondent.

COOPER, C.—At the close of the testimony the judge directed the jury to return a verdict for defendant in the sum of $2,145.95, which it did, and judgment was accordingly entered. Plaintiff prosecutes this appeal from the judgment on a bill of exceptions.

This controversy arose out of the following facts: In December, 1894, the Southern Pacific Company leased to Austin and Doulton, the assignors of plaintiff, for a term of five years from January 1, 1895, for oil-development purposes, certain lands in the townsite of Summerland, in the county of Santa Barbara, for which the lessor was to receive a royalty of one fourth of the oil produced from the land. The lessor, in the leases, reserved the privilege of terminating the same, at any time, upon thirty days' notice.

On the 14th of November, 1895, the plaintiff was in possession of the leased lands, and had wells thereon producing some eight carloads of oil per month, and he also owned and controlled other oil-producing wells at Summerland outside

those on the leased lands. The defendant corporation was using, and required for its use, at its works in Santa Barbara County near Summerland a large quantity of oil.

After some negotiations, and after the oils produced and controlled by plaintiff in Summerland had been tested by defendant, the contract was entered into in regard to the sale and delivery by plaintiff to defendant of certain oil as specified in the contract.

This action was brought by plaintiff to recover $1,449.20 for oil furnished defendant under the contract.

Defendant in its answer set forth facts showing a breach of the contract on the part of the plaintiff, and claimed damages for such breach in the sum of $5,497.19. The evidence showed, without conflict, that the plaintiff had furnished oil to defendant under the contract, for which plaintiff had not been paid, amounting to $1,447.20. The defendant claimed that by reason of the breach of contract by plaintiff it was compelled to buy oil elsewhere, and that the amount it had to pay, including freight charges, in excess of which the oil would have cost if plaintiff had complied with his contract, was the sum named in its answer. It appeared, without conflict, that the defendant bought oil of other parties in Summerland and at Santa Paula to make up the plaintiff's deficiencies which he failed to furnish under the contract, and that the extra cost to defendant was the sum of $3,593.45. In the calculation the court refused to allow the defendant for certain sums claimed to be the differences in value of the oils purchased from the oils agreed to be furnished. The court directed the jury to return a verdict for defendant for the difference between the latter sum and the amount so due for oil furnished under the contract, the amount of the verdict being $2,145.95.

The main argument of counsel, and the issue in the case, is as to the construction of the contract. The Southern Pacific Company gave thirty days' notice, and thus terminated the leases of the lands from which plaintiff was obtaining the principal part of the oil which he was furnishing to the defendant under the contract, and the claim of plaintiff is, that the termination of this lease had the effect of releasing him from his contract with defendant, and upon the solution of this question the case must be determined. The evidence

shows that the lease was terminated at the urgent request of plaintiff, and that he wrote several letters to the Southern Pacific Company urging the giving of the thirty days' notice, so that the lease might be terminated and that he might be thus relieved from his contract with the defendant. He afterwards wrote to the Southern Pacific Company, asking that it destroy the letters thus written, so that they could not be used as evidence against him. After the leases were terminated he procured a new lease from the Southern Pacific Company, which he had previously negotiated, by the terms of which the company took the entire product from the leased premises at a price more advantageous to plaintiff than he was getting from defendant. But these matters are not deemed very material, as, under the view we take of the case, the plaintiff was liable in damages for a breach of his contract, even if the lease had not been terminated by his own procurement. The contract so far as material here is as follows: "Said J. C. Wilson hereby agrees that on the conditions and terms hereinafter set forth he will furnish and deliver to said Alcatraz Asphalt Company at Summerland, in the county of Santa Barbara, state of California, so much crude mineral oil, produced or to be produced during the term of this agreement, at the said Summerland, as the said Alcatraz Asphalt Company shall require for their business and work in the county of Santa Barbara, (whether for fuel or for other purposes,) and as the said Alcatraz Asphalt Company shall from time to time order from said J. C. Wilson; said quantity, however, not to exceed twelve cars per month, but the said Alcatraz Asphalt Company shall have the privilege of purchasing as much more oil as they may require at the same price as herein mentioned on condition that the said J. C. Wilson shall produce enough more oil after giving the Southern Pacific Company their one-quarter share. . . . The said J. C. Wilson shall not be liable to the said Alcatraz Asphalt Company for losses or damages resulting from his failure to supply and deliver oil to said corporation hereunder as demanded, when such failure shall be due to the act of God or unavoidable accidents over which the said Wilson has no control, the complete exhaustion of the oilwells now in operation or hereafter to be opened in the said Summerland or vicinity, or the Southern Pacific Railroad

Company revoking their leases, made out to J. H. Austin and H. J. Doulton, December 20, 1894; but excepting in cases where said Wilson shall be unable for the last aforesaid causes to deliver the oil which may be demanded of him under this contract, he shall at all times during the term hereof be required to supply to said Alcatraz Asphalt Company all of the crude Summerland oil which it shall order or require, excepting as hereinabove mentioned, and he shall also from time to time keep on hand such supply of said oil as will enable him to meet the current demands and orders of the said Alcatraz Asphalt Company and shall not, for the purpose of supplying any other customer or person ordering oil from him, diminish his supply or stock of said oils to such a point as to interfere with the fulfillment by him of all orders which he may receive during the term hereof from said Alcatraz Asphalt Company. This contract and the obligation of said parties hereunder are to continue in force and effect from date hereof to and until the thirty-first day of December, 1896, inclusive. . . . And in consideration of the above covenants and agreements on the part of said Wilson, said Alcatraz Asphalt Company binds itself and agrees hereby to pay for the oil which may be ordered and received by it hereunder from said Wilson at the rates hereinabove specified, and further agrees that during the said period of this contract they will make no purchase of crude mineral oils for use at their said works in the county of Santa Barbara, other than from said Wilson as hereinabove provided; excepting, however, that said Alcatraz Asphalt Company shall have and hereby reserves the right to purchase and receive from other persons than said Wilson during the term of this contract such other oils, not exceeding in any calendar month an amount equivalent to four (4) tank cars full, as they shall desire or require of lighter quality than that usually furnished or offered to them by said Wilson.''

It is evident that the above contract does not release plaintiff from damages for his failure to perform the same, except in the cases therein mentioned. The first is the act of God, or unavoidable accidents, and no claim is made that plaintiff was released upon that ground. The second is the complete exhaustion of the wells in operation or to be operated in Summerland or vicinity. It is not contended that the oil-

wells in Summerland or vicinity were exhausted. The third, upon which plaintiff relies, is the Southern Pacific Company revoking its leases to Austin and Doulton. If by reason of the termination of the leases, without the fault of plaintiff, there was not a sufficient supply of oil produced at Summer-- land to enable plaintiff to supply the amount required by defendant under the contract, then to that extent he would be released; but it is the contention of the plaintiff that revoking the leases operated to release him completely from his obligations under the contract. In a letter to defendant dated May 13, 1896, after he had received the thirty days' notice from the Southern Pacific Company, he wrote to the defendant inclosing the notice, and in the letter said: "The inclosed document is self-explanatory, and you will see by reading it that I had notice to vacate the R. R. premises, and of course that will sever our contracts as well, but I will let you have what oil I can up to the time of my removal." On the following day plaintiff wrote to the manager of the Southern Pacific Company in reference to the contemplated new lease, and said: "How soon will you have the new lease ready for me to sign? . . . I do not want to seem too hasty, but I am very anxious to get to work under the new lease and new contract."

The leases were terminated by the notice given by the Southern Pacific Company on July 1, 1896, and plaintiff never offered nor endeavored to furnish the defendant with oil after that date. There was no proof that there was not sufficient oil elsewhere from the production at Summerland and vicinity with which to supply the defendant. The manager of plaintiff testified (and it is not contradicted) "that there were twelve carloads of oil produced in that field outside of Mr. Wilson's production." The contract contemplated the release of plaintiff only in case the failure to deliver the oil was caused by the leases being revoked, and otherwise he shall "be required to supply" such oil as contemplated by the contract. If the plaintiff were to be released from his contract by reason of the revoking of the leases, why was it therein stated that he should be released by the complete exhaustion of the oil-wells therein surrendered or thereafter to be opened therein? If the contract had reference to the oil to be produced from the leased lands only, why did it

state that the oil was to be produced at Summerland? If plaintiff had procured the oil from other outside parties at Summerland and tendered it to defendant, could defendant have refused it because it was not produced from the leased lands? The contract and each and every clause thereof must be read together so as to arrive at its true intent and meaning. The exhaustion referred to in the contract was to be so complete as to leave either no oil or not enough procurable anywhere in the market from the production at Summerland to enable the plaintiff to fulfill his contract. If the leases should be revoked, it was contemplated that the oil should be procured elsewhere, if it could be obtained in Summerland. When the contract recites that unless plaintiff, from the aforesaid causes, shall be unable to supply the oil demanded under the contract, it shall at all times be required to supply the same, it excludes all other causes by implication. If, after the leases were revoked, there was oil enough produced from other wells in Summerland with which to supply defendant under the contract, it would not lie in the mouth of plaintiff to say that he could not purchase the outside oils or obtain control of them. Such condition would have been good if inserted in the contract, but it was not so inserted. The scheme and purpose of the contract are inconsistent with the idea that the oil to be furnished under it was to be limited to that produced or controlled by plaintiff from the leased lands, and it necessarily contemplated the possible delivery to the defendant of other oils to be produced by other parties at Summerland and which the plaintiff, if necessary, undertook to procure for that purpose.

The rule is, that if performance of a contract is possible, it is none the less a breach, although the obligor himself may have become wholly unable to perform. The impossibility must consist in the nature of the thing to be done, and not in the inability of the party to do it. If what is agreed to be done is possible and lawful, it must be done. Difficulty of accomplishing the undertaking will not avail the party who commits a breach of the contract. If a party expressly undertakes to do a thing lawful in itself, and not necessarily impossible under all the circumstances, and does not do it, he must make compensation in damages, though the performance was rendered impracticable, or even impossible, by some un-

foreseen cause for which no provision is made and over which he had no control, but against which he might have provided in his contract. The rule has its foundation in common sense and honesty, and compels parties to abide by their contracts. Any other rule would leave all contracts in a sea of uncertainty without rudder or compass. (See generally on the subject, *Klauber* v. *San Diego Street-Car Co.*, 95 Cal. 353; Hare on Contracts, 639; *Sample* v. *Fresno Flume etc. Co.*, 129 Cal. 223; *Wilmington Trans. Co.* v. *O'Neil,* 98 Cal. 1.) Counsel claims that the court erred in receiving in evidence certain letters and invoices because they were only admissible for the purpose of showing the construction put upon the language of the contract by the parties, and as the court held that the contract could be construed by the language therein contained, and was not ambiguous, for this reason the evidence was not admissible. The evidence if immaterial was harmless. It did not cause the court to construe the contract in any other way than to hold it valid according to its mandates. The evidence was consistent with the construction placed upon the contract by the court.

The claim is made that it was error for the court to permit the witness Bell to summarize the testimony as to oils purchased by defendant from other parties and the additional cost to plaintiff. No reason is given as to why it was error, and we do not perceive any. The jury were not required, nor was the court required, to make calculations involving many additions and subtractions in figures. The course pursued was the proper one. (Code Civ. Proc., sec. 1855, subd. 5; Greenleaf on Evidence, 16th ed., sec. 563h, and cases cited.)

There was in fact no dispute as to the figures; and if the construction placed upon the contract was correct, the instruction to the jury was proper. The evidence would not have authorized a different verdict, and in such cases it is proper to instruct the jury as to the verdict they should find. (*Los Angeles etc. Co.* v. *Thompson,* 117 Cal. 601; *O'Connor* v. *Witherby,* 111 Cal. 528.) In this case there was no conflict in the evidence as to any material fact upon which the jury were required to pass.

We have examined other alleged errors, but find nothing that would call for a reversal of the judgment.

We therefore advise that the judgment appealed from be affirmed.

Harrison, C., and Chipman, C., concurred.

For the reasons given in the foregoing opinion the judgment appealed from is affirmed.

Henshaw, J., Lorigan, J., McFarland, J.

Hearing in Bank denied.

Beatty, C. J., dissented from the order denying a hearing in Bank.