[L. A. No. 4395. In Bank.—May 28, 1918.]

## CALIFORNIA WELL DRILLING COMPANY (a Corporation), Respondent, v. CALIFORNIA MIDWAY OIL COMPANY (a Corporation), Appellant.

CONTRACTS—GENERAL VERDICT—UNANSWERED SPECIAL INTERROGATORY.— The jury having found a general verdict for the plaintiff, it may well be true that the jury must be considered to have found an acceptance by the defendant of the work under the contract sued on, though the special interrogatory calling for a finding thereon was unanswered.

ID.—DRILLING OIL WELL—ACTION FOR PRICE—ACCEPTANCE OF WORK— INSUFFICIENCY OF EVIDENCE.—In this action to recover the contract price of drilling an oil well, under the terms of which the plaintiff was to drill the well "into the oil sand or to a depth of 3,500 feet if required" by the defendant, it is held that the evidence was insufficient to justify a finding that the defendant accepted the well when drilled to a depth of 3,215 feet.

ID.—INSTRUCTION BASED ON UNTENABLE THEORY ERRONEOUS.—An instruction in such case to the effect that if the jury found from the evidence that the defendant accepted the well at 3,215 feet, and thereafter requested the plaintiff to straighten the hole and casing, and that the plaintiff thereupon did so in a workmanlike manner as

provided for in the contract, but that the defendant refused to accept the well as straightened, then the plaintiff was entitled to judgment under the terms of the contract, was erroneous, since such instruction was based upon the plaintiff's untenable theory of the case that the well was accepted as complete when it was drilled to 3,215 feet, and it wholly ignored the question of actual drilling "into the oil sand, or to a depth of 3,500 feet if required by" the defendant.

ID.—TRIAL AND INSTRUCTION UPON ERRONEOUS THEORY—CONSTRUCTION OF CONTRACT BY JURY.—In such case the trial of the action and instructions to the jury upon the theory that it was to construe the contract were erroneous, since, the terms of the contract being ascertained, the court should have construed the same, and instructed the jury as to the meaning thereof.

ID.—DRILLING INTO OIL SAND—MEANING OF "OIL SAND."—In the contract in the instant case, construed in the light of its purpose and terms, the provision that the well should be drilled "into the oil sand or to a depth of 3,500 feet if required by" the defendant was not complied with by drilling into any oil sand at any depth; but the well having been drilled to secure oil in paying quantities, the jury should have at least been instructed that the "oil sand" contemplated by the contract was "producing oil sand," and that in default of such producing oil sand the defendant was justified in requiring the well to be drilled to a depth of three thousand five hundred feet, unless the phrase "into the oil sand" had some other special local meaning or customary construction with reference to which the parties contracted.

ID.—CONSTRUCTION OF CONTRACT BY COURT—EXTRINSIC EVIDENCE IN AID OF CONSTRUCTION.—Where extrinsic evidence is introduced to aid in the construction of a contract, it is still the duty of the court to construe the contract in the light of such evidence.

ID.—DISPUTED EXTRINSIC FACTS—HYPOTHETICAL INSTRUCTIONS.—If extrinsic facts introduced in aid of the construction of a contract are disputed, the case may go to the jury with hypothetical instructions to render a verdict one way if certain facts are found and another way if the facts are found differently.

ID.—MIXED QUESTION OF LAW AND FACT—CORRECT APPLICATION OF LAW BY JURY ASSUMED.—In the instant case the question of the completion of the well having been submitted to the jury as a mixed question of law and fact, the supreme court on appeal must assume that the jury, not being clothed with power to decide the law incorrectly, applied the law correctly to the facts; in other words, that they correctly construed the contract as requiring the drilling of the well into "producing oil sand" and applied that construction to the facts presented to them.

ID.—INSUFFICIENCY OF EVIDENCE.—Evidence in the instant case examined and found insufficient to justify the finding of the jury that the well was drilled into the oil sand according to the contract.

ID.—INSTRUCTIONS—CONFUSING INSTRUCTION AS TO CUSTOM.—In view of the fact that no oil was produced from the well, and that the burden was on the plaintiff to establish the completion of the well, an instruction given by the court at the request of the plaintiff that, if there was no custom as to who should test the oil sand, the plaintiff did not have to show that it tested the oil sand, unless the contract expressly or impliedly so provided, could only tend to confuse the jury, the question as to whose duty it was by custom or otherwise to test the well not being properly involved in the case.

APPEAL from a judgment of the Superior Court of Kern County, and from an order denying defendant's motion for a new trial. Milton T. Farmer, Judge.

The facts are stated in the opinion of the court.

Thomas Scott, Sr., Geo. E. Whitaker, Bradner W. Lee, Bradner W. Lee, Jr., and Kenyon F. Lee, for Appellant.

E. L. Foster, and Chas. A. Barnhart, for Respondent.

WILBUR, J.—This is an appeal from a judgment after verdict for $44,452.19, the contract price for drilling two oil wells by plaintiff for defendant, and from the order denying defendant's motion for a new trial. Well No. 7 was drilled under contract dated February 7, 1912. Well No. 6 was drilled under a contract dated December 31, 1912. Both wells were to be paid for by the foot. It is admitted that well No. 6 conformed to the contract, and that plaintiff is entitled to be paid the contract price therefor. All the difficulties in the case grow out of the contract for the drilling of well No. 7 and its relation to the second contract. The question is whether or not the plaintiff completed the well as required by the contract for the drilling of well No. 7, and, if not, whether said well was accepted by the defendant as completed in August, 1912, at which time plaintiff claims that it had sunk well No. 7 to a depth of 3,215 feet, and "into the oil sand," and had placed therein at the request of the defendant a perforated four-inch pipe; that the well was thereupon accepted as completed, but that five days thereafter, defendant having discovered that the well was crooked, returned it to the pos-

session of the plaintiff to be straightened; that thereafter, for a year, the plaintiff was actively engaged in attempting to straighten the well, and in July, 1913, having straightened the well and sunk it to a depth of 3,241 feet—26 feet farther than it was at the time it was accepted by the defendant—they had thus fully performed their contract. The case thus presented two main questions, that of acceptance and of completion. Plaintiff contends that the jury having found a general verdict in its favor, it must be considered to have found an acceptance, even though the special interrogatory requiring a finding thereon was unanswered, and this may well be true. (*Benson* v. *Southern Pac. Co.*, 177 Cal. 777, [171 Pac. 948].) Defendant claims that the evidence was insufficient to justify such a finding. On this subject, at the request of the plaintiff, the jury was instructed as follows: " . . . if you find from the evidence that the defendant accepted well No. 7 at 3,215 feet, and that the said defendant thereafter requested the plaintiff to straighten the hole and the casing in said well, and that the plaintiff thereupon proceeded so to do and actually did straighten the casing in said well in the manner as testified, in a workmanlike manner as provided for in said contract, and that the defendant refused to accept said well as straightened, you will then find that the plaintiff is entitled to judgment under the terms of the contract." The contract for drilling well No. 7 recited that it was the purpose of the parties to "drill a well for oil," and therein the plaintiff "agrees to drill a well on said land at the location indicated . . . into the oil sand or to a depth of 3,500 feet if required by said first party," etc. It provided that certain payments were to be made "60 days after the perforated casing is carried into the oil sand, or to 3,500 feet." This instruction completely ignores the question of actual drilling "into the oil sand or to a depth of 3,500 feet if required by said first party," and is based wholly upon plaintiff's theory of the case that well No. 7 was accepted as complete in August, 1912. But plaintiff's theory was not tenable. It is undisputed that five days after such alleged completion and acceptance the well was returned to plaintiff for further work thereon, which work continued for nearly a year. During the progress thereof the contract of December 31, 1912, for drilling well No. 6, was entered into by the parties, in which it is, in effect, expressly agreed that said well No. 7 was uncompleted and

unaccepted, by the following provision therein contained: "It is further understood and agreed by the parties hereto, that the fifty per cent monthly payments herein provided for shall be suspended *until the completion of that certain well on the property of the party of the first part known as well No. 7, on which the party of the second part is now drilling under an agreement dated February 7, 1912;* but all payments so suspended shall become due and payable as agreed *upon completion of said well No. 7. In the event well No. 7 cannot for any reason be completed according to its contract,* then the said well herein provided for to be drilled shall be understood by the parties hereto to replace said well No. 7 and to be *so accepted* by the party of the first part as the well provided to be drilled in said contract of February 7, 1912." (Italics ours.) There was not only no sufficient evidence to justify a finding of acceptance in August, 1912, but in view of the contract of December 31, 1912, the jury might have been properly instructed that there was no acceptance and no completion of well No. 7 prior to December 31, 1912, and as no acceptance at any time after August, 1912, was claimed by plaintiff, the instruction complained of should not have been given. The case was tried and the jury instructed upon the theory that it was to construe the contracts involved, and to this end a number of rules of construction were given to the jury, and the refusal to give others is assigned as error. But the terms of the contracts being ascertained, the court should have construed the same and instructed the jury as to the meaning and effect thereof. (*Luckhart* v. *Ogden,* 30 Cal. 547, 556; *Swain* v. *Grangers' Union etc. Co.,* 69 Cal. 186, [10 Pac. 404] ; *Holloway* v. *McNear,* 81 Cal. 154, 157, [22 Pac. 514].) It would serve no useful purpose to set out at length the various provisions of the contract for drilling wells Nos. 6 and 7. Suffice it to say that the contract for drilling well No. 7 provided that, in the event of the failure to drill that well to a sufficient depth, a well should be drilled in lieu thereof, and made certain stipulations in regard to the expenditures in drilling such well. The later contract of December 31, 1912, for the drilling of well No. 6, referred to the contract for drilling well No. 7, stating, in effect, as above quoted, that if No. 7 was not completed, No. 6 should be regarded as having been drilled in lieu thereof. The parties herein differ upon the question as to whether or not under a proper construction

of these two contracts the defendant was entitled to credit upon the contract price for drilling the second well (No. 6) of the amount expended by it for materials, etc., furnished to the plaintiff while drilling said well, in the event that No. 7 was not completed, stipulated to be $17,077.78. The construction of these two contracts was a question of law for the court, and the jury should have been instructed that in the event it found that well No. 7 was not completed, the verdict should have been for the contract price for drilling well No. 6, less the stipulated credit of $17,077.78. Instruction No. 15, given at plaintiff's request, based upon the theory that such credit could not be allowed unless a mutual mistake in the execution of 'the contract of December 31, 1912, was proved by a preponderance of the evidence, was erroneous; as it was also to leave the jury to determine whether the contract of December 31, 1912, as executed, provided for such credit. In determining whether or not the plaintiff had completed its contract for well No. 7 when it was drilled to a depth of 3,241 feet and tendered to the defendant, we are required to construe the contract. At plaintiff's request the jury was instructed, " . . . if you find from the evidence that well No. 7, was drilled *into oil sand* to the depth alleged by the plaintiff, which is 3,241 feet, *in accordance with the terms of the contract,* and that the well was finished in a workmanlike manner, you must find for the plaintiff . . . " (Italics ours.) And again, "'You are to determine whether well No. 7 was drilled *into the oil sand* according to such contract.'" And at defendant's request the jury was instructed, "If you find it to be a fact from the evidence introduced in this case that the term 'oil sand' means a 'sand-producing oil,' and that plaintiff did not drill into a sand 'producing oil,'" etc. While both parties thus induced the court to present the question of completion to the jury as a mixed question of law and fact, to be determined by them, a fair construction of the plaintiff's instructions left it to the jury to say that any drilling into any "oil sand" was a sufficient compliance with the contract. Construed in the light of the purpose and terms of the contract, the provision that the well should be drilled "into the oil sand or to a depth of three thousand five hundred feet if required by said first party," etc., was not complied with by drilling into any oil sand at any depth. The well was drilled to secure oil in paying quantities. The jury should at least have been instructed

that "the oil sand" contemplated by the contract was producing oil sand, and that in default of such producing oil sand defendant was justified in requiring the well to be drilled to a depth of three thousand five hundred feet, unless the phrase *"into the oil sand"* has some other special local meaning, or customary construction, with reference to which the parties contracted. Both parties introduced evidence as to the meaning of the terms of the contract. We are, therefore, not called upon to consider the admissibility of such evidence, as to which we express no opinion. But where extrinsic evidence is introduced to aid in the construction of a contract, it is still the duty of the court to construe the contract in the light of such evidence. (12 L. R. A. 376, note; 1 Blashfield's Instructions to Juries, sec. 66, p. 131.) If such extrinsic facts are disputed, the jury must pass on these disputed facts. "The case may go to the jury with hypothetical instructions from the court to render a verdict one way if certain facts are found, and another way if the facts are found differently." (Id., sec. 66, p. 133.) The construction of the contract in the light of the real facts is a matter of law. As was said by this court in a recent case involving the use of extrinsic evidence to construe a will: "In such cases where the evidence of the facts is in conflict, it is permissible for . . . the jury, to find the facts. . . . But the application to the will itself of the facts found, admitted or established, present a question of legal construction, which is as purely a question of law as is the construction of the will without resort to extrinsic evidence. . . . Again, it is fundamental that in all cases where extrinsic evidence is admissible to aid in expounding the will, the evidence is limited to this single purpose. It is considered, for the purpose of explaining and interpreting the language of the will, and is never permitted to show a different intent or a different object from that disclosed (though perhaps obscurely) by the language of the will itself. (6 Wigmore on Evidence, pp. 2472–2474.)" (*Estate of Donnellan,* 164 Cal. 14, 19, [127 Pac. 166]. See, also, *Estate of Thomson,* 165 Cal. 290, 296, [131 Pac. 1045]; *First National Bank* v. *Bowers,* 141 Cal. 253, [74 Pac. 856].)

The question of the completion of the well being thus submitted to the jury as a mixed question of law and of fact, appellant contends that the evidence was insufficient to justify the finding of the jury that the well was completed. Inas-

much as the jury was clothed with no power to incorrectly decide the law, we must, in considering this contention, assume that they applied the law correctly to the facts. In other words, we must assume that they correctly construed the contract and applied that construction to the facts as presented to them. The contract, as we construe it, required the drilling of the well into producing oil sand, that is, sand-producing oil in reasonably paying quantities, and in default of such a showing of oil to continue to drill the well to a depth of three thousand five hundred feet if required by the defendant. The question, then, is, Does the evidence justify the finding of the jury that the plaintiff completed the well by drilling the same into producing oil sand? The theory of the plaintiff is that it had drilled a well "into the oil sand" when it had attained the depth of 3,215 feet, that the well was then accepted and returned to it merely for straightening, and that when they had straightened the well and again sunk it to a depth of 3,215 feet they had completed the well, in that it was again just as far into the oil sand as it was in the first instance. The defendant denied that it ever accepted the well or ever considered it as completed or ever took it over as completed. It is admitted by the plaintiff that it never tested the oil well either by pumping or bailing. It is shown beyond question that the well never produced any oil and that no oil was ever taken therefrom except the oil that was pumped into it for the purpose of testing it. In the effort to straighten and deepen the well the point of 3,215 feet was passed at least four times; that is to say, by reason of loss of tools and other defects in the well it was necessary to go back and redrill the well, and in so doing the well was drilled past this point at least four times. Plaintiff's general manager testified that they had no log of any of these drillings which showed any oil sand; that when the well had reached a depth of 3,241 feet it was in blue shale. The log of the original drilling to a depth of 3,215 feet was lost as to the drilling for the last week or two, in July and August, 1912, and the only testimony offered as to the showing of oil sand was the testimony of some of the well drillers and of plaintiff's general manager. One of these drillers testified that in his opinion the well showed signs of oil sand for about ten feet. On cross-examination he admitted that the rotary drill might show signs of oil sand long after it had been passed through, and that a showing of

ten feet of oil sand by a rotary drill might mean only four or five feet of oil sand. If it is true that there were four or five feet of producing oil sand at about 3,215 feet, the fact remains that the plaintiff, upon whom the burden lay of show‍ing that such sand was producing sand, made no effort to test the well. It would seem that this was a case for the application of the doctrine that where weaker and less satisfactory evidence is offered, when it appears that stronger and more satisfactory was within the power of the party, the evidence offered should be viewed with distrust. (Code Civ. Proc., sec. 2061, subd. 7.) But viewed in the light of the conduct of the parties subsequent to the alleged acceptance of the well, it is clear that the well was never completed. If we assume in favor of the respondent that when the contract of December 31st referred to well No. 7 as uncompleted, it had reference to the fact that the well was crooked and in a process of being straightened and that when straightened to a depth of 3,215 feet it would be considered by the parties as complete, we are met by a great many difficulties. On March 13, 1913, the plaintiff entered into a contract with two subcontractors to drill well No. 7 to a depth of three thousand three hundred feet. No good reason for making this contract is offered consistent with the theory that the well was to be completed when down to a depth of 3,215 feet and straight. There was correspondence between the plaintiff and defendant in regard to the completion of well No. 7. On May 31, 1913, plaintiff wrote the defendant: "We are undecided whether to go on and try and finish No. 7 or not. If we do not finish No. 7, the string of four and a quarter inch casing which is in No. 7 could be used on No. 6. We have some drillers who are very anxious to take another labor contract to finish No. 7. They say they are pretty sure of finishing well No. 7, but we are pretty badly disgusted with this well and will hold up the contract until the writer sees you. We have about concluded that if your company will pay us for No. 6 at the contract price of $6.50 per foot, then we will quit No. 7 as it is, and by doing that the string of four and a quarter inch casing could go to No. 6 and we would drill a new well for No. 7 under No. 7 contract. But if your company wants to hold up the payment on No. 6 until No. 7 is completed, we will take one more chance in contracting the completion of No. 7. There is a chance, although small, of finishing No. 7. But if

your company would prefer to have a new well drilled we will start drilling on a new well, or you may take No. 7 as it is and pay us for No. 6 at the contract price and wait until you finish No. 6, and then the condition may be favorable for your going ahead with No. 7." Plaintiff's general manager, Mr. Edwards, testified that on June 4 or 5, 1913, he made defendant a proposition that "if they would accept No. 6 and pay for it at the contract price and release me on well No. 7 that I would accept it. I also stated that the outlook of finishing well No. 7 was very discouraging; that we had been working on it pretty nearly a year and had not made any headway toward getting it finished, and we would either drill a new well to replace No. 7, or take another chance of going ahead and finishing, or I believe I told them at that time I would take one more chance of finishing it under some new men who thought very strongly that they could finish the well. That was Mr. Chappis and Mr. Gibson. They didn't accept my proposition, so I put my men on No. 7 and went to work again." Mr. Chappis testified that when he went to work on well No. 7 the tools went down somewhere in the neighborhood of 3,217 to 3,220 feet. The evidence, therefore, is insufficient to justify the finding of the jury that the well was drilled into the oil sand according to the contract.

At the plaintiff's request the court instructed the jury as follows: "The court instructs the jury that if you find that there was no custom in the West Side Oil Fields as to who should test the oil sand, then the plaintiff does not have to show that it tested the oil sand, unless the contract expressly or impliedly provides for such test." In view of the fact that no oil was obtained from well No. 7 and that the burden was on the plaintiff to establish completion of the well, this instruction could only tend to confuse the jury. The question as to whose duty it was by custom or otherwise to test the well was not properly involved in the case. The effect of the instruction must have been to suggest to the jury that it was unnecessary for plaintiff to give evidence of a test of the well in order to recover.

The judgment and order are reversed.

Sloss, J., Melvin, J., Richards, J., *pro tem.*, Shaw, J., Victor E. Shaw, J., *pro tem.*, and Angellotti, C. J., concurred.