[Civ. No. 3934.  First Appellate District, Division One.—January 31, 1922.]

WESTERN INDUSTRIES COMPANY (a Corporation), Respondent, v. MASON MALT WHISKEY DISTILLING COMPANY (a Corporation), et al., Appellants.

[1] SALES—CONTRACT FOR WASTE RESULTING FROM DISTILLATION OF MOLASSES—METHOD OF TRANSPORTATION—EVIDENCE.—In this action to recover damages for breach of a contract for the sale and delivery of a certain waste or residuum resulting from a distillation of molasses from which alcohol was extracted, which breach the defendant contended was justified for failure to obtain barges in conjunction with tank cars for transportation of the waste, the evidence is sufficient to support the contention that transportation was possible even with the elimination of barges.

[2] ID.—CONSTRUCTION OF CONTRACT—EXCLUSIVE METHOD OF TRANSPORTATION NOT PROVIDED.—Under the contract involved in this action, no exclusive method of transportation of deliveries was contemplated, and the defendant could not excuse its failure to perform on the ground that the use of barges involved an illegal spillage in state waters, if other means of transportation existed.

[3] ID.—DELIVERY—DUTY OF SELLER.—Where under a contract for the sale and delivery of goods the seller has obligated itself to make deliveries, mere inconvenience or added expense is not an excuse for failure to employ any feasible or reasonable method of transportation.

[4] ID.—INTENTION OF PARTIES—METHOD OF DELIVERY—INSTRUCTION. In an action for a breach of contract for the sale and delivery of molasses waste, it was not error to refuse to submit to the jury the question as to whether or not it was the intention of the parties that the barge method of transportation was intended to be the exclusive method, in the absence of any such contention under the pleadings or at the trial.

[5] ID.—THEORY OF TRIAL — INSTRUCTION.—Where such action was tried upon the issue whether transportation by tank cars was possible or feasible, and not whether the contract excluded transportation by tank cars as a method of delivery, it was not error to refuse to submit to the jury the question of intention of the parties as to method of transportation.

[6] ID.—DAMAGES—EVIDENCE—RESALE CONTRACTS.—In such action it was not error to admit in evidence contracts made by plaintiff for the sale of the potash which it manufactured from the waste purchased from defendant.

[7] Id.—Resale Contracts—Loss of Profits—Rule—Exception.—
While, in the absence of notice of a resale contract of the com-
modity contracted for, a buyer cannot recover, as special damages,
his loss of profit on such resale, but is limited to the market
price of the product, such doctrine applies only where the com-
modity has a fixed market price and the buyer is in a position
upon breach to supply himself with the article contracted for.

APPEAL from a judgment of the Superior Court of the
City and County of San Francisco. John Hunt, Judge.
Affirmed.

The facts are stated in the opinion of the court.

Morrison, Dunne & Brobeck, Norman A. Eisner, Edmund
Tauszky, Frank M. Angellotti and Thomas P. Boyd for Ap-
pellants.

J. C. Meyerstein, Oscar Sutro and Pillsbury, Madison &
Sutro for Respondent.

TYLER, P. J.—This action was brought to recover dam-
ages against defendant company for breach of contract. By
a separate count plaintiff has joined as codefendants the
stockholders of defendant company. Trial was had by jury
and a verdict in the sum of $300,000 was rendered in favor
of plaintiff. From the judgment entered thereon this appeal
is taken.

The contract sued upon was entered into by and between
defendant Mason Malt Whiskey Distilling Company (here-
after referred to as the Mason Company) and the Western
Grain and Sugar Products Company, the plaintiff's predeces-
sor in interest. The contract was made on November 10,
1916, and was assigned to plaintiff on April 26, 1917, this
company having succeeded to the business of the Western
Grain Company. Both parties operated plants for the
manufacture of alcohol, plaintiff's works being located at
Agnew, Santa Clara County, and the defendant's near Sausa-
lito, in Marin County. The process of manufacture at both
plants involved the distillation of molasses from which al-
cohol was extracted. From this process there resulted a

7. Measure of damages for delay in delivery of goods sold, note,
21 Ann. Cas. 607.

certain waste or residuum commonly called slops. These slops contained a certain percentage of potash. Prior to the time the contract was entered into defendant company had been discharging this residuum through a pipe-line into Richardson's Bay. Plaintiff's assignor had developed a process for the incineration of such slops and the extraction of potash therefrom, and was desirous of obtaining those of defendant company to be used for this purpose. A contract was accordingly entered into by the parties for the sale of the same. The contract provided that the slops from defendant's plant up to 70,000 gallons per day and any amount in excess thereof that plaintiff could receive up to 100,000 gallons per day should be delivered by defendants to plaintiff at its plant at Agnew. The gravity was provided for and it was stipulated that the slops should contain not less than 1.25 units of soluble $K_2O$ (potash) per ton of 2,000 pounds. The price was fixed at fifty cents per unit of potash contained in a ton plus freight at the rate of 85 cents per ton, this combination of prices being equivalent to $1.18 per unit of soluble potash contained in the slops per ton, net, f. o. b. cars at Agnew. Any reduction in freight rates was to be shared equally between the seller and buyer, and any profits arising in freight on account of concentration of the slops at plant of seller should belong to the seller. For the purpose of determining the potash content it was provided that a sample of each carload shipment was to be drawn by both parties, by the seller at point of loading cars, and by the buyer at point of emptying cars. The contract contained a clause that in the event of strikes or for any other cause interfering with transportation or production of the goods, seller might suspend deliveries during actual time of such delay or interference, and a similar provision protected buyers against receipt of deliveries. The contract was to remain in force until July 15, 1917, with renewal options to extend as long as the buyer might see fit, under the same terms and conditions, such renewals, however, not to extend for a period thereafter longer than two years. Performance of the contract was entered upon, and, subsequently, on April 26, 1917, it was assigned to plaintiff, the successor of the original company, and after this date all slops were billed by defendant to the new company and paid for by it. Plaintiff renewed the

contract pursuant to the option at various times and for stated periods, until finally renewal was requested for the full remaining period of one year. This final election of renewal was made on March 21, 1918, and after defendants had notified plaintiff that they would make no further deliveries, for the reason, as they stated, that they lacked suitable transportation facilities, and no further deliveries were made, notwithstanding that the contract provided that in the event of means of transportation failing that deliveries might be *suspended*, not terminated. Thereafter this action was brought. The complaint alleges the making of the contract on November 10, 1916, with plaintiff's assignor, the assignment and ownership by plaintiff of the contract, and the breach thereof, and concludes with a prayer for damages. The answer of defendants denied that the Mason Company failed or refused to make deliveries contrary to the terms of their contract, and alleged in substance that transportation was interfered with, and that the only possible means of delivery was by barges in conjunction with tank cars, and that for various reasons defendants were unable to obtain the same. About a year after the complaint was filed and after the trial had commenced, defendants asked for and obtained permission from the court to file an amendment to their answer, under which a special defense was interposed. The amendment alleged that it was impossible for defendants to make deliveries without a material quantity of slops flowing into waters of the state, and that criminal proceedings had been instituted against defendants for violation of the state laws, and that the board of supervisors of the county of Marin had notified the defendant company that if it continued to pollute the waters of the state proceedings would be instituted to abate its business as a nuisance. That by reason thereof it is alleged defendant was forced and compelled to cease making deliveries. At the trial, and for the purpose of proving that lack of means of transportation did not prevent deliveries, and that the refusal of defendant company to make the same was willful and deliberate, and was occasioned by its desire to utilize plaintiff's process and to reap greater profits by manufacturing the potash for itself, plaintiff offered, and there was received in evidence, testimony to show that prior to the time that defendant company notified plaintiff that deliveries could no longer

be had, that the former engineer of plaintiff was employed by defendant, who erected a plant similar to that of plaintiff's, and that immediately thereafter shipment of slops declined, and that defendant itself produced during the life of the contract a large quantity of potash salts for which they received a sum greatly in excess of the amount of damages here recovered. Further testimony was introduced to show that an officer of defendant company admitted to the general manager of plaintiff that the reason for failure to make deliveries was that defendants desired to extract the potash themselves so as to make more money. It also appears from evidence offered by plaintiff and received by the court, that defendant company made no effort to obtain towboats, tank cars, or barges after it ceased to make deliveries, and that both tank cars or barges were readily obtainable, and that shipment without the use of barges could have been made by tank cars at Waldo shipped to Agnew. Evidence on this subject is abundant, but we do not deem a recital thereof necessary. [1] It is sufficient to say that it is ample to support the contention that transportation was possible even with the elimination of barges. It was appellant's contention below, and is here, that it was not obliged to transport the slops by any other method that would subject it to higher expense than that which it incurred by shipment in barges. The court construed the contract as meaning that transportation by barges in conjunction with tank cars was not the exclusive or qualified method provided for deliveries by the contract, and this conclusion is reflected in the rulings of the court in the giving and refusal to give instructions to the jury upon this subject. A recital of these instructions would lengthen this opinion to undue proportions and answer no useful purpose. The court was consistent in its rulings with reference thereto, which were to the effect that no exclusive method of transportation of deliveries was contemplated by the parties, and that neither could defendant excuse its failure to perform on the ground that the use of barges involved an illegal spillage in the state waters if other means of transportation existed. [2] This conclusion finds support in the express language of the contract. Nothing is said therein with reference to "barges." The sampling clause provides that the seller shall draw samples at the point of loading cars,

by the buyer at the point of emptying cars. It further provides that freight weights are to govern. These provisions would strongly indicate that the parties did not contemplate an exclusive delivery by barges in conjunction with tank cars. The means of transportation, however, was of no moment to plaintiff. Its object was to have deliveries made under the contract. Transportation by barges in conjunction with tank cars was agreeable to it, and, indeed, all deliveries were had during the performance of the contract by this method. The mere fact, however, that the parties had in contemplation this means as a possible method of delivery does not prove that it was the sole method by which deliveries were to be made. The case was tried upon the theory whether or not transportation by all tank car route was feasible, assuming barge deliveries to have been impossible. Considerable testimony was had upon the subject by both sides. The construction contended for by appellants at the trial was that if they could not ship by barges in conjunction with tank cars a different method was not practical or feasible, and that they were not required to ship at all. Plaintiff's theory was that transportation was practicable and feasible by an all-rail method, and that defendant was bound to make deliveries in this manner if delivery by barges was impossible. **[3]** Defendant, by the terms of its contract, having obligated itself to make deliveries in tank cars at Agnew, mere inconvenience or added expense did not excuse it from failing to employ any feasible or reasonable method of transportation. If the language of the contract is clear and unambiguous, the fact that compliance with its terms incurs greater expense than was anticipated does not excuse performance. Parties *sui juris* cannot escape performance of their undertakings because of unforeseen hardship. (*Sample* v. *Fresno etc. Co.,* 129 Cal. 222 [61 Pac. 1085]; *Metzler* v. *Thye,* 163 Cal. 95 [124 Pac. 721]; *Klauber* v. *San Diego Street Car Co.,* 95 Cal. 353 [30 Pac. 555]; *Ryan* v. *Rogers,* 96 Cal. 349 [31 Pac. 244].) If defendants had intended to exclude all-rail deliveries they should have so contracted. (*Fleishman* v. *Meyer,* 46 Or. 267 [80 Pac. 209]; *Withers* v. *Moore,* 140 Cal. 591 [74 Pac. 159]; *Wilson* v. *Alcatraz Asphalt Co.,* 142 Cal. 182 [75 Pac. 787]; *Sheffield Furnace Co.* v. *Hull Coal Co.,* 101 Ala. 446 [14 South. 672].) They not only did not do so by express

terms in their contract, but adopted language, as above pointed out, indicating that such was not their intention. Assuming, therefore, that the use of barges became impossible, such fact did not excuse nondelivery if delivery could be had by the use of tank cars exclusively. The evidence shows that such delivery could be had, and in addition thereto that plaintiff offered to absorb any additional freight rate by either method of transportation if only deliveries were made. We therefore conclude on this question that the construction given by the trial court was correct and finds support in the evidence. The instructions to the jury upon this subject were therefore proper. [4] In this connection it is further urged that the court erred in not submitting to the jury the question as to whether or not it was the intention of the parties that barge method of transportation was intended to the exclusion of the more expensive all-tank-car method, it being the claim of appellant that the jury should have been instructed hypothetically to render a verdict one way or the other upon the subject. It must be conceded that if the question in respect to transportation and delivery was a debatable one, it would be error to remove the question from the jury. In such a case the matter should be submitted to the jury with hypothetical instructions to render a verdict upon the facts. (*California Drilling Co.* v. *California Midway Oil Co.,* 178 Cal. 337 [177 Pac. 849]; *Brett* v. *Vanomar Producers,* 45 Cal. App. 286 [187 Pac. 758].) Where, however, the evidence introduced to aid in the construction of a contract is undisputed, it is still the duty of a court to construe the contract in the light of such evidence, the question being still one of law to be determined by the court and the jury instructed as to the meaning and effect thereof. (*Green* v. *Soule,* 145 Cal. 96 [78 Pac. 337]; *Pierce* v. *Merrill,* 128 Cal. 464 [79 Am. St. Rep. 56, 61 Pac. 64]; *Aguirre* v. *Alexander,* 58 Cal. 21.) As heretofore indicated, no contention was ever made either under the pleadings or at the trial that an exclusive method of transportation was ever intended by the terms of the contract. At no time was it claimed that the contract did not contemplate shipments without the use of barges in conjunction with tank cars. The original answer proceeded under the theory that barging was the only *feasible method* of transportation, and that barges were not obtainable, and

the amendment to the answer was had for the purpose of showing that transportation could not be made by this method on account of threatened prosecution. Under neither defense, however, was an issue tendered that the contract was ambiguous or that the parties intended to provide thereby that barges were to be used to the exclusion of an all-rail shipment or by any other reasonable and practicable method of transportation. [5] The whole case was tried upon the issue whether transportation was possible or feasible, not whether the contract excluded transportation by tank cars as a method of delivery, but whether the transportation by tank cars was feasible. It is now claimed that the freight allowance indicated an exclusive delivery by means of barges in conjunction with tank cars. We have examined the record and we fail to find where any such claim was ever made, and counsel have directed us to none. It is true, as pointed out by counsel, that it appeared in evidence that the original barge rate to Oakland long wharf was fifteen cents per ton. It is also true that the manager of defendant company testified that the tank rate from that point to Agnew was seventy cents per ton, and that these two items would amount to eight-five cents, the freight allowance fixed, which, added to the fifty cents per unit of potash would equal the $1.18 combination price per unit of potash provided for under the contract. It is also true, however, that documentary evidence showed that the tank car rate from Oakland pier to Agnew was seventy-five cents and not seventy cents, the combination of these charges being ninety cents. It further appears that the tank car rate was subsequently reduced twenty-five cents, to fifty cents per ton. However this may be, while these facts appeared in evidence during the course of the trial it was at no time contended by defendant that they in any manner indicated that an exclusive delivery by barges in connection with tank cars was thereby intended. No such issue was ever raised at the trial. Plaintiff proved by sufficient testimony in response to the only issue raised that the use of barges was unnecessary and that it was reasonable and feasible to make deliveries by tank cars exclusively. It also proved that defendant made no effort to obtain either tank cars or barges after March, 1918, although there is evidence to show that both were abundantly available. No attempt ever having been

made by defendant to show what the parties intended by way of transportation of deliveries, or that any evidence indicated such intent, it was not entitled to an instruction upon this subject. The question was never treated by the parties as one of fact, but as one of law. Defendants cannot now urge that the court should have instructed the jury upon the question of what the parties may have intended. This question of intent could not be raised for the first time after trial. (*Hanson* v. *Fricker*, 79 Cal. 283 [21 Pac. 751]; *Brett* v. *Vanomar Producers, supra; Elsom* v. *Neff*, 27 Cal. App. 174 [149 Pac. 375].)

Counsel for defendants have cited us to numerous authorities to support their contention that this question of intent as to the method of delivery, should have been submitted to the jury. A review of those cases would answer no useful purpose. In all of them an ambiguity in the contract involved existed in which disputed extrinsic facts were in issue, and their determination was properly a matter for the jury. No such condition is here involved. The case was not tried upon this theory. The jury was fully and fairly instructed upon the subject. We are therefore of the opinion that there is no merit in this contention.

[6] Further objection is made that the trial court erred in admitting in evidence contracts made by plaintiff for the sale of the potash which it manufactured from the slops purchased from defendant. These contracts showed that plaintiff had sold the potash salts for the entire period of its contract with defendant, to the American Agricultural Chemical Company, for $4 per unit. The admissibility of this evidence is assailed on the ground that such contracts constituted resale agreements not disclosed to defendant at the time it entered into the contract, for which reason, it is argued, they can neither measure plaintiff's damage nor be evidence of market value. The objections arise upon the admissibility of the contracts and the instructions of the court to the jury upon the measure of damages in reference thereto. [7] The general rule upon the subject is that in the absence of notice of a resale contract of the commodity contracted for, a buyer cannot recover, as special damages, his loss of profit on such resale, but is limited in his damages to the market price of the product. (1 Sedgwick on Damages, sec. 163.) This doctrine, however, applies only where

the commodity has a fixed market price, and the buyer is in a position upon breach to supply himself with the article contracted for. It can have no application where, as here, the contracts are not, properly speaking, resale contracts. The subject matter of these contracts dealt with the sale of potash, a manufactured product. The contract here sued on was one dealing with the sale of slops. This commodity was not obtainable elsewhere. There was, so far as the record shows, no market price for it. Defendants had knowledge that plaintiff had made the purchase thereof for a particular purpose, for the correspondence had between the parties with reference to the sale of the slops at and before the time the contract was entered into shows that defendant knew that plaintiff contemplated the manufacture of potash salts therefrom for which it had offers of purchase, and in the manufacture of which it intended to construct additional and costly improvements in anticipation of deliveries. In such a case the authorities are clear that where a breach occurs under such circumstances the vendor is liable on his contract for any damages resulting to the vendee arising from a failure to deliver the property where such damages are not remote or speculative, and that his contract is admissible to prove value. (*Lillard* v. *Kentucky Distilleries Co.*, 134 Fed. 168 [67 C. C. A. 74]; *Richner* v. *Plateau Live Stock Co.*, 44 Colo. 302 [98 Pac. 178]; *Equitable Gas Light Co.* v. *Coal Tar Co.*, 65 Md. 73 [3 Atl. 109]; *Hockersmith* v. *Hanley*, 29 Or. 27 [44 Pac. 497].) Here the contracts were offered and received, not for the purpose of proving the amount received for the product, but for the sole and limited purpose of tending to show that it could be sold and that it had some market value, and that plaintiff's profits were not problematical or speculative. This evidence was responsive to the issue that the product had a value. Nowhere in the record does it appear that the plaintiff claimed that his measure of damages was fixed by the price contained in the contract. Such a purpose was expressly disclaimed by counsel in his offer and by the court in the reception of the evidence. The trial judge, in referring thereto, frequently expressed his view that evidence of what an article could be sold for was some evidence of market value. Defendant complains of lack of instructions upon this question. The purpose of the admission was made perfectly clear to the

jury, and if counsel desired any particular instruction upon the subject he should have asked for it. Here plaintiff was not seeking to recover any special damage, but simply the loss of certain and fixed profits arising from the breach, for which plaintiff is entitled to recover. (*National Oil & Refining Co.* v. *Producers etc. Co.*, 169 Cal. 740 [147 Pac. 963].) We are of the opinion that there was no error in this ruling of the court. (*Phillips* v. *Stark,* 186 Cal. 369 [199 Pac. 509] ; *Meyer* v. *McAllister,* 24 Cal. App. 16 [140 Pac. 42] ; *Carey Coal Co.* v. *Beebe Concrete Co.*, 88 Kan. 515 [Ann. Cas. 1914B, 806, 44 L. R. A. (N. S.) 499, 129 Pac. 191].) If we assume, however, that the contracts were inadmissible for any purpose and were therefore improperly received, still we do not see how defendants can avail themselves of this alleged error. The substance and contents thereof were already in evidence without objection at the time of the formal offer. It was in evidence what the manufacturing cost of the potash salts amounted to, and also the profit derived therefrom, and that the American Agricultural Chemical Company bought and had offered to buy all this commodity that plaintiff could manufacture during the entire period of the contract, at the price of $4 per unit. This is all that the contracts showed. In addition thereto both parties introduced evidence as to the market value of the product, and this evidence shows without conflict that the market price of potash at Agnew was, at the date of any of the contracts, higher than the price fixed therein. The admission of the contracts in evidence, therefore, was not prejudicial. The introduction of evidence that can have no material effect beyond that which is already in the record without objection is harmless and not reversible error. (*Mackenzie* v. *Hodgkin,* 126 Cal. 591 [77 Am. St. Rep. 209, 59 Pac. 36] ; 4 Corpus Juris, p. 978.)

And finally, it is contended that the contract was not assignable, and the defendant Mason Company was not estopped by its deliveries under the extensions to decline to assent to plaintiff's final attempt to renew the contract. We see no merit in this contention. The assignment shows that plaintiff was but the successor of its predecessor. The contract contained no provision against assignment, and, furthermore, from and after the date thereof defendant com-

pany recognized plaintiff as the successor of its predecessor under the contract, for after the assignment all slops were billed by it to plaintiff, and payment was received by it from plaintiff, and deliveries were made pursuant to the various extensions until defendant's final refusal to make deliveries under the last renewal period. Under these circumstances defendants are estopped to question the assignment. (*Randol* v. *Tatum,* 98 Cal. 390 [33 Pac. 433].)

Other points are governed by the views herein expressed, and do not require further discussion. There is ample evidence in the record to show that the undelivered units of potash which defendant failed to deliver, and upon which defendant made large profits, justified a verdict for an amount in excess of that herein rendered.

For the reasons given the judgment is affirmed.

Richards, J., and Kerrigan, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on March 2, 1922, and a petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on March 30, 1922.

All the Justices concurred except Waste, J., who was absent.