No. 2805.—ESCOUBAS et al. *v.* LOUISIANA PETROLEUM AND COAL OIL COMPANY

In interpreting agreements, an elementary rule is to construe the clauses together, giving to each the sense which resul.s from the whole instrument.

Parties are put *in mora* by demanding that they do that which, in a legal sense, they ought to do and can do.

A distinction exists in this regard between a *modus* and a suspensive potestative condition. The former is obligatory and payable, and if the party bound is passively violating his ob i-gation, he must be put in default before an action will lie. The latter is one whose accomplishment depends on personal choice; the party on whom it is imposed is free to accomplish it or not; and to put him in default would be a vain thing, since it would be to demand that he should do what he is under no obligation to do.

An agreement was made between plaintiffs, owners of mineral lands, and the assignor of defendants, of a twofold character, including a license to mine, and a lease for ten years in case of successful discovery. The defendants lost all rights thereund r by the lapse of time, no workable quantity of petroleum having been discovered within a period limited by the contract. The plaintiffs then agreed to refrain from declaring a forfeiture of this contract for ten years from its date, provided the defendants would carry on the search for petroleum constantly and without cessation. Held—That the latter agreement was conditional; that its conditional was suspensive and potestative, and that when the defendants failed to carry on their search for petroleum, the plaintiffs were entitled to declare the forfeiture of the contract by suit, and claim possession of their lands, without a formal putting in default.

APPEAL from Fourth District Court, parish of Orleans. *Théard*, J. *W. B. Koontz & Elliott, Christian Roselius* and *Albert Voorhies*, for plaintiff and appellant. *A. N. & H. N. Ogden* and *J. D. Hill*, for defendant and appellee.

HOWE, J. On the fifth of October, 1865, Hilaire Escoubas and Truxton Lowell entered into an agreement in writing, with J. W. Mallet, by which it was stipulated that the latter should have "the entire, absolute and undivided control of all petroleum, mineral, oil or other similar products existing beneath the surface of the land" owned by the former, in Calcasieu parish, and described in the first article of the agreement, and "the right to bore, dig and mine for said petroleum or similar product, to extract the same, to prepare it for market by refining or otherwise, to transport, sell and dispose of said petroleum in any way he might see fit, and in general to have and enjoy all the mineral rights of the parties of the first part (Escoubas and Lowell), in and with reference to said land. The above rights and privileges to continue for the term of ten years from the date of the signature of this contract."

By the second, third, fourth and fifth articles of the agreement, the party of the second part, Mallet, had the right to occupy such land as might be necessary for such buildings as would be required for operatives, etc., and for the prosecution of the "proposed workings;" the right to cut certain timber and wood; the right of pasturage for animals to be employed in the work, and the right of way for necessary roads—these privileges to continue for ten years.

By the sixth and seventh articles, Mallet agreed to pay the sum of $20,000 in cash, by November 1, 1865, and in the event of oil or petro-

leum being found in "workable quantity," to pay to the parties of the first part one-half the gross product of such oil or petroleum.

The tenth article is as follows:

"In the event that the said party of the second part, his agent or assigns, shall not, before the thirty-first of December, 1866, make experimental borings on said land, and obtain oil or petroleum in workable quantity, all rights of the said party of the second part, his agents or assigns, growing out of this contract, shall cease, (without any claim on the part of the said party of the second part, his agents or assigns, to restoration of any portion of the above stipulated payment of $20,000) ; but in the event that oil or petroleum shall be found upon said land prior to said thirty-first of December, 1866, all said rights shall continue for the full term of ten years."

On the first of June, 1866, Mallet transferred his rights under this agreement to the defendants in this action. No petroleum was discovered in "workable quantity" within the time limited by the tenth article, namely, the thirty-first of December, 1866. On the fourth of January, 1867, Escoubas and Lowell made an agreement with the defendants, recognizing this transfer, and the pendency of certain claims to the land by a third party, and covenanting in consideration of the premises, "to extend the forfeiture of said contract and lease of the fifth of October, 1865, aforesaid, as set forth in the tenth section of said contract, from the thirty-first of December, 1866, up to and until the thirty-first day of December, 1868;" and further agreed "not to declare a forfeiture of the lease now transferred to and being the property of said company" (the defendants) "during the unoccupied term of said lease; provided, however, that said company shall. use every exertion to develop the resources of said lands, and shall continue constantly and without cessation to carry on the work necessary to procure oil or petroleum upon said lands, and shall operate upon said lands to the fullest possible extent for the production of petroleum or coal oil, it being understood, however, that said work shall not be considered as having ceased should the company be prevented temporarily from continuing the same by inevitable accident, overpowering force, or the act of God."

The defendants proceeded with the work, and bored one well to the depth of twelve hundred and thirty feet, but failed to discover petroleum in "workable quantity." At the depth, however, of about four hundred feet, they penetrated a bed of crystalized sulphur, of remarkable thickness, and this discovery appears to be the cause of the controversy now before us.

This action is instituted to recover possession of the lands in question, on the allegation that the defendants were without means, money or credit to carry on the works, and that the work had been discontinued ; that it was not being carried on to the fullest extent possible

36

for the production of oil or petroleum, and not in such a manner as said company was bound to do to avoid the forfeiture of the lease.

The defendants answered by denying generally the allegations of the petition, except as admitted in the answer. They admitted the execution of the several agreements above mentioned, averred that the tenth section of the act of fifth of October, 1865, was annulled and abrogated by the agreement of January 4, 1867, (from which we have quoted the clause to which the defendants here refer), and declared that they had fully complied with the conditions of this clause by continuing constantly and in the most judicious manner to carry on the necessary work to procure oil and petroleum. They, also, made a reconventional demand for damages.

The plaintiff filed a supplemental petition, alleging that after the commencement of this suit, eleventh of August, 1869, and up to the time of the filing of the supplemental petition, the defendants had ceased all work, and had abandoned the work and left the premises; and this was met by a general denial and a further reconventional demand for damages.

It appears by the record that the parties agreed that the question of the right to the sulphur should be determined in this controversy; the defendants claiming the whole of it, and the plaintiffs making a similar exclusive claim on their part. The judge a quo arrived at the conclusion that the non-compliance with the condition imposed on the defendants is to be considered as a passive violation of the contract, and that a putting in mora was an indispensable prerequisite to maintain the action. Beyond this, he was of opinion that the defendants had not violated their agreements, and that they were entitled, on principles of equity, to one-half the net profits of the prospective sulphur mining. The prayer of plaintiffs for possession was, therefore, rejected, as well as the reconventional demand of the defendants; and a judgment rendered, decreeing the defendants to be entitled to the exclusive control of the digging and boring of all mines on the property leased, including the sulphur lately discovered, and the plaintiffs entitled to one-half the net profits arising from the digging of said mines, etc. Both parties complain of the judgment. The plaintiffs have appealed; and the defendants, answering, pray that it be amended in their favor so as to give them all the sulphur during the remainder of the ten years, half of it thereafter, in perpetuity, and their damages in reconvention.

The pleadings, the testimony, and the printed and oral discussions in this case, have taken a wide range, but we do not find ourselves called upon to pass on all the questions raised. Taking up those which we deem essential to a proper decision of the controversy, we are, in the first place, satisfied, from an examination of the testimony, that no petroleum was found up to December 31, 1865, nor was any

found in workable quantity up to December 31, 1868. Of this there is no dispute. We further find that the defendants had not, up to the institution of this suit, in August, 1869, used every exertion to develop the resources of the lands in question, and had not " constantly and without cessation carried on the work necessary to procure oil or petroleum," and had not " operated upon said lands to the fullest possible extent for the production of petroleum or coal oil." On the contrary, we find in June, 1869, the work abandoned, the defendants deeply in debt, their treasury empty, and their engineer deserting them because his wages remained unpaid. We find the desperate expedient suggested of paying the workmen in stock of the company. We find that thereafter, and up to November, 1869, the same condition of affairs, as alleged in the supplemental petition. Indeed, we gather from the whole record that the search for petroleum in this instance, as in thousands of others, was a failure, and was abandoned by the defendants; who devoted their energies, thenceforward, to an endeavor to procure some means, not for the further search for petroleum, but for the mining of the sulphur, to which they claimed a right.

Upon this state of facts, what is the legal result ? In interpreting the agreements of October 5, 1865 and January 4, 1867, we must follow the familiar rule of construing the clauses together, giving to each the sense which results from the whole instrument. Domat, p. 1, b. 1, t. 1, § 2; C. C. 1950. We find the first agreement twofold—a right to mine for petroleum and similar products (and whether this included the right to mine for sulphur we are not called on to determine), and, in the event of successful mining, a right for ten years from the date of the agreement to one-half the gross product. The tenth article of the agreement, which we have quoted, repels the idea of an absolute, unconditional lease of the property for ten years. On the contrary, if the search for petroleum was unsuccessful up to December 31, 1866, all the rights of the party of the second part were to cease; and they did cease, for the search up to that time was unsuccessful. If on the first January, 1867, the plaintiffs had demanded possession of their lands, it can hardly be imagined that the defendants would have resisted the demand, or would have claimed that they must first be put *in mora*. Defendants are put in default by demanding that they do something that in a legal sense they ought to do, and can do.

Now, on the fourth of January, 1867, another agreement is made, the important clauses of which we have quoted. By this the plaintiff entered into two obligations—the one absolute, the other conditional. They said, in effect, to the defendants : " The agreement with Mallet, of which you are transferrees, is forfeited, but we now promise to waive that forfeiture. Up to the thirty-first of December, 1868, the waiver is absolute. But, beyond that time, we will create a condi-

tional obligation, its condition shall be suspensive, and, so far as you are concerned, potestative. We agree *not to do* a certain thing, provided you do something which lies entirely in your volition. If you will continue, unremittingly, to mine for petroleum, we will refrain from declaring a forfeiture which already exists." This construction disposes, at once, in the negative, of the question whether a formal putting in default was necessary. We must distinguish in this regard between a *modus* and a condition proper. The former is obligatory, and if the party bound is passively violating his obligation he must be put in default. But the condition in this case, at once suspensive and potestative, is one whose accomplishment depends on personal choice, and the party on whom it is imposed is free to accomplish it or not. "Je vous donne le fonds cornélien, si vous faites telle chose; voilà une condition. Je vous donne le fonds cornélien, à la charge par vous de faire telle chose; voilà un mode, parce que la charge qui vous est imposée ne suspend ni ne retarde l'exécution de notre convention, et que son inexécution, de votre part, doit seule entraîner sa résolution. C'est bien là le caractère essentiel qui distingue le mode de la condition suspensive, dont il se sépare par les caractères de la condition résolutoire, et encore par ceux qui lui sont propres. Dans les conditions dont l'accomplissement dépend d'un fait personnel, *celui à qui il est imposé* est libre de l'accomplir ou non." * * * "Le mode, au contraire, est une chose, ou un fait, stipulé pour soi-même, ou pour autrui, *obligatoire et payable.*" Larombière, Obligations, vol. 2, pp. 6 and 7.

It would in this case, therefore, have been a vain thing for the plaintiffs to have demanded from the defendants the doing of something they were under no obligation to do, and the putting *in mora* was unnecessary, or, rather, legally, impossible.

We are constrained therefore, to conclude that the plaintiffs are entitled to the possession of the lands. It is therefore ordered that the judgment appealed from be avoided and reversed, and that the plaintiffs have judgment as prayed for, for possession of the lands described in their petition, that a writ of possession issue in due time therefor; and that the defendants pay the costs of both courts.