The judgment appealed from is affirmed, at appellants' cost.

MONROE, C. J., takes no part.

---

(84 South. 485)

No. 23607.

### ROWE v. ATLAS OIL CO. et al.

(April 5, 1920. Rehearing Denied May 3, 1920.)

*(Syllabus by Editorial Staff.)*

1. **Mines and minerals** ⚖➡79(3)—**Where oil leases require payment of rentals to prevent forfeiture, rents must be paid by time fixed.**

Where an oil and gas lease required the drilling of a well within a specified time and gave the lessee an option to prevent forfeiture by paying $1 an acre within fixed period, payment must be made on or before the date specified, and where drafts drawn for such payment were dishonored, and funds were not placed in bank for a considerable time thereafter, forfeiture must be deemed to have occurred.

2. **Mines and minerals** ⚖➡79(6)—**Landowner who had granted oil and gas lease held not estopped from asserting forfeiture.**

Where a landowner who had granted an oil and gas lease stated that the drilling on adjacent premises satisfied him, and he would not ask for lease money, no estoppel can be predicated on such statement, where it did not appear that the lessor or his assignee accepted or acted on the statement.

3. **Words and phrases—"Prevent."**

To "prevent" an occurrence means to come before, and thereby stop the occurrence. What has already occurred cannot be prevented, and the privilege of preventing the forfeiture of an existing right does not imply or carry with it the privilege of reacquiring the right after it shall have been forfeited.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Prevent.]

Appeal from First Judicial District Court, Parish of Caddo; R. D. Webb, Judge.

Suit by W. H. Rowe against the Atlas Oil Company and others, begun as an action for slander of title and converted into an action against the Consolidated Progressive Oil Corporation and another, to declare null ab initio, or in the alternative to declare forfeited an instrument purporting to be an oil and gas lease. From a judgment for plaintiff, defendants appeal. Affirmed.

Wilkinson, Lewis & Wilkinson, of Shreveport, for appellants.

Foster, Looney & Wilkinson, of Shreveport (Thigpen & Herold, of Shreveport, of counsel), for appellee.

O'NIELL, J. This suit was commenced against the Atlas Oil Company, said to be represented by N. C. McGowen, and against the Consolidated Progressive Oil Corporation, as an action for slander of title. Learning that the mineral rights alleged to have been claimed by the Atlas Oil Company were claimed by N. C. McGowen individually, and that the Atlas Oil Company did not claim any interest in the property, plaintiff, by supplemental petition, made McGowen a party defendant. Thereafter, by another supplemental petition, plaintiff converted the suit into an action to declare null ab initio, or, in the alternative, to declare forfeited, an instrument purporting to be an oil and gas lease, and another instrument purporting to be a renewal thereof, claimed by the defendants, Consolidated Progressive Oil Corporation and N. C. McGowen, as transferees by mesne conveyances from the original lessee, A. E. Wilder. The cause of nullity alleged by plaintiff was that the landowners, as lessors, did not receive any con-

sideration, that the lessee did not incur any obligation, and that what purported to be obligations, in the original instrument and in the so-called renewal or extension thereof, depended upon potestative conditions. The cause for demanding a forfeiture and annullment of the contracts, if they should be held to have been originally valid, was alleged to be that the original lessee, A. E. Wilder, and his alleged transferees, had failed to perform either of the two alternative obligations, either to begin the drilling of a well on the land within the time specified, or to pay the sum stipulated for preventing a forfeiture.

The defendants, answering the petition and supplemental petitions, denied that there was a want of mutuality of obligations in either the original contract of lease or in the extension or renewal thereof, admitted that drilling of a well was not commenced within the time specified, but averred that payment of the sum specified, to prevent a forfeiture, was made in time to prevent the forfeiture of the lease; and they denied that the payment should have been made in advance, or on or before any specified date, or before demand therefor. Defendants pleaded, as an estoppel, that G. T. Shaw, the landowner from whom plaintiff acquired his mineral lease, stood by and saw the defendant Consolidated Progressive Oil Corporation spend large sums of money, drilling wells and developing the wild-cat territory, in which Shaw's land was situated, into one of the most productive oil fields in the country; that the defendant Consolidated Progressive Oil Corporation drilled a well on a tract of land adjacent to the land in question, which well proved the oil-producing value of the territory; and that the well was drilled at the request of Shaw, and upon his promise and assurance that he would recognize as valid all leases held by the Consolidated Progressive Oil Corporation on his lands.

On the issues thus presented, judgment was rendered in favor of plaintiff, annulling, as far as it affected the land leased to plaintiff, the Wilder lease, dated the 27th of July, 1916, and claimed by the defendants, and declaring plaintiff the owner of the mineral rights under and by virtue of his lease from G. T. Shaw, dated the 16th of January, 1916.

There is no dispute about the main facts of the case. On the 27th of July, 1916, F. T. and J. H. King, who then owned the land, in undeveloped territory, leased to A. E. Wilder, for mining exploration and development, the N. W. ¼ of section 30 in T. 21 N., R. 7 W., and the E. ½ of N. E. ¼ of section 26 in T. 21 N., R. 8 W., all said to contain 210 acres, more or less. No cash or other consideration was given by Wilder for the lease. The only stipulation having the appearance of an obligation on his part was that he should, within six months, commence drilling a well either on the leased premises or on another of the tracts of land on which he expected to acquire leases, within five miles from the town of Homer, and prosecute the drilling with due diligence to the depth of 2,600 feet, unless oil or gas should be found in paying quantities at less depth. The apparent obligation, however, was coupled with the stipulation merely that, in the event of the lessee's "failing to do so," all of his rights under the agreement should cease and determine; and it was also stipulated that the lessee might remove from the land any structures placed there at any time. It was further stipulated that, on completion of a well within five miles from Homer, the lessee or his heirs or assigns should, within a year from the date of completion of the well, begin drilling a well on the land described in the contract, and prosecute the drilling with due diligence to a depth of 2,-600 feet or until completed; and that, in the event of his failing to do so, all of his rights under the agreement should cease and determine. It was stipulated that, if the

first well to be drilled on the leased land should be a producer, the lessee should "reasonably well develop the said property," and that, if the first well to be drilled on the leased land should be a dry hole, the lessee should, within six months after completing the dry hole, commence drilling another well on the leased premises; and that, in the event of his failing to do so his rights under the agreement should cease. It was stipulated that, if the contemplated operations should result in the production of oil or gas in paying quantities, the lessee should pay to the grantors, as royalty, one-eighth of all oil produced and saved from the leased premises, and $200 per annum for each gas well from which gas should be either used or sold. The stipulation most pertinent to this suit was as follows, viz.:

"It is especially understood and agreed that the said Wilder may prevent the forfeiture of this lease' at the expiration of the said one-year period as provided in paragraphs two and three [referring to the period of one year from the date of completion of a well within five miles from Homer], on paying to the grantors the sum of one dollar per acre, and thereupon the said lease and transfer, with all of the rights hereunder, shall be extended for a period of one year from the expiration of said one-year period, with all the rights and privileges and subject to all of the conditions herein specified, and may so extend said lease and transfer for a period of three years, on the payment of said sum per acre annually."

The grantors declared in the instrument that they accepted the stipulations as a valuable and sufficient consideration for the rights therein transferred, including the right of extension, and that the lease should remain in force as long as oil or gas could be produced from the land in paying quantities.

On the 21st of November, 1916, F. T. and J. H. King sold to G. T. Shaw, the land described in the lease to Wilder.

The agreement of Wilder to begin, within six months, drilling a well within five miles from Homer, and to prosecute with due diligence the drilling to a depth of 2,600 feet, was carried out by the Atlas Oil Company, not on the land described in the lease in contest, but on land described in another lease, transferred by Wilder to the Atlas Oil Company. The well was completed on the 27th of March, 1917. It was then incumbent upon Wilder, or his transferees of the lease in contest, to begin, not later than the 27th of March, 1918, the drilling of a well on the land described in this lease, or pay $1 an acre, $210, to prevent a forfeiture of the lease. No drilling was done or commenced on the land described in the lease now in contest, nor was the dollar per acre, or any other consideration, paid for preventing a forfeiture of the lease, on or before the 27th of March, 1918. Therefore, by the terms of the contract, all of the lessee's rights thereunder "ceased and determined" on that date. However, on the 16th of May, 1918, G. T. Shaw and J. H. and F. T. King signed the following agreement, written on the back of the original contract of lease, viz.:

"I, the within lessor, do hereby consent and agree that the time for paying the one dollar per acre, as expressed in the second line of paragraph six of the within lease, be and the same is hereby extended to January 1, 1919; all other provisions of the within lease shall be and remain unchanged. This May 16, 1918."

The only other persons who signed the indorsement were T. F. Denman and A. B. Coleman, who signed merely as witnesses. The so-called extension or renewal of the lease was not accepted by any one, nor was any one obligated therein as lessee. Denman was then superintending the drilling of a well for the Consolidated Progressive Oil Corporation, on an adjacent tract of land, belonging to a Mrs. Featherstone. But he signed the instrument individually, merely as a witness, and not as lessee or as representing a lessee.

The instrument signed by G. T. Shaw on

the 16th of May, 1918, therefore, was merely a proposition to A. E. Wilder, or his transferees, that he or they might revive whatever rights he had acquired under the original agreement, dated the 27th of July, 1916, by paying to Shaw $1 per acre, $210, on or before the 1st of January, 1919. We are not called upon to decide what the effect would have been if Wilder or his transferees had commenced drilling a well on the land described in the lease in contest on or before the 1st of January, 1919. No drilling was done or commenced on the land described in the lease now in contest—in fact it is not pretended that anything had been done in that respect—on or before the 1st of January, 1919, or even when G. T. Shaw leased a part of the land to plaintiff, on the 16th of January, 1919.

The only question is whether Wilder or his transferee, the Consolidated Progressive Oil Corporation, prevented a forfeiture of whatever right he or his transferees had, by paying $1 per acre, in compliance with the proposition of the landowner, Shaw, dated the 16th of May, 1918.

[1, 3] A stipulation in a contract that the rights of a certain party thereto shall be forfeited on a specified date or at the end of a specified time unless the party shall do something specified or pay a specified sum of money to prevent the forfeiture means that what is to be done or paid to prevent the forfeiture must be done or paid before the date specified, or before the expiration of the time specified, when the forfeiture would otherwise occur. To "prevent" an occurrence, in the most general and popular use and meaning of the word, as well as from its etymology, has no other meaning than to come before, and thereby stop, the occurrence. What has already occurred cannot be prevented. The privilege of preventing the forfeiture of an existing right does not imply or carry with it the privilege of reacquiring the right after it shall have been forfeited. It is well settled by the rulings of this court that, under the stipulation in a mining lease, the lessee's rights shall become forfeited unless he begins operations within a time specified or pays a specified sum to prevent the forfeiture and extend his rights for an additional time specified, the payment must be made, to prevent the forfeiture, before the expiration of the time specified for beginning operations. See Escoubas v. Louisiana Petroleum & Coal Oil Co., 22 La. Ann. 280; Jennings-Heywood Oil Syndicate v. Houssiere-Latreille Oil Co. (on rehearing) 119 La. 793, 44 South. 481; Pure Oil Operating Co. v. Gulf Refining Co., 143 La. 284, 78 South. 560.

There is no dispute of the fact that no payment was made by Wilder or by any of his transferees, to prevent a forfeiture of the lease now in contest, on or before the 1st of January, 1919. On the 31st of December, 1918, Wilder deposited in a bank in Homer, La., where Shaw resided, several sight drafts, drawn on the Consolidated Progressive Oil Corporation, in New York, to pay the rentals due under several leases which Wilder had transferred to the corporation. Attached to each draft was a description of the land on which the rental was to be paid; but the land described in the lease now in contest was not described in any of the drafts or memoranda attached thereto. The bank did not cash the drafts or accept them as cash items, but received and forwarded them for collection. One of the drafts was for $965, and another was for $200. On the 13th of January, 1919, the Consolidated Progressive Oil Corporation brought in a producing oil well on the N. E. ¼ of section 30, T. 21 N., R. 7 W., a tract of land which Shaw had leased to Wilder, under a separate contract. The well was very near the land described in the lease now in contest. On the next day, the 14th of January, Wilder deposited in the bank in Homer, a draft on the Consolidated Progressive Oil Corpo-

ration for $210, the exact amount which should have been paid, before the 1st of January to prevent a forfeiture of whatever rights Wilder or his assigns had acquired under the agreement signed by Shaw on the 16th of May, 1918. The land described in the lease now in contest, however, was not described in the draft. In the meantime, the drafts that were drawn and deposited by Wilder on the 31st of December had been dishonored. Soon after the well was brought in on the 13th of January, 1919, Shaw called at the bank and asked whether the drafts deposited by Wilder had been honored; but the bank had not then received the information from its New York correspondent. Shaw called and made the same inquiry every day until, on the 16th of January, 1919, he was informed that the bank had received a telegram from its New York correspondent, saying that the drafts had been dishonored and returned. Shaw then leased to the plaintiff, Rowe, for mining operations, the E. ½ of N. W. ¼ and the N. E. ¼ of S. W. ¼ of section 30, in T. 21 N., R. 7 W., the E. ½ of N. W. ¼ being a part of the land described in the lease now in contest.

The unpaid drafts drawn by Wilder on the 31st of December, 1918, and returned by the New York bank, were received by the bank in Homer, on the 17th of January, 1919. On the same day, the Homer bank received by wire from the New York office of the Consolidated Progressive Corporation a deposit for $965 to cover the dishonored draft for that amount. The Homer bank immediately notified Shaw of the deposit, and offered to place the amount to his credit; but he refused to receive it, saying, in substance, that he would not accept any rentals unless the amounts due under all of the leases were paid. On the following day, the 18th of January, 1919, the Homer bank received a telegram, saying that there was deposited to its credit in New Orleans a sum sufficient to cover all other drafts drawn by A. E. Wilder on the 31st of December, 1918, and the draft for $210 drawn by him on the 14th of January, 1919. The Homer bank promptly notified Shaw of the receipt of the telegram; but he refused to accept payment of the amounts to cover the draft for $200 or the draft for $210. It appears that he accepted the amount to cover the dishonored draft for $965; but we are not now concerned with that transaction, because it is not pertinent to the lease now in contest. It is sufficient to say that Wilder or his assigns did not offer to pay the $210 within the time specified in Shaw's proposition of May 16, 1918, to prevent a forfeiture of whatever rights Wilder or his assigns had under the lease in contest; and Shaw did not accept Wilder's or the Consolidated Progressive Oil Corporation's subsequent offer of payment, or otherwise condone their neglect to pay in time.

[2] In support of the plea of estoppel, T. F. Denman testified, over the plaintiff's objection, that while the well was being drilled on Mrs. Featherstone's land, Shaw told him that, if the Consolidated Progressive Corporation would drill the next well on his land, he would not ask for any lease money. It appears that whatever Shaw said, in that respect, was said prior to his written proposition of date May 16, 1918, and was in the nature of a complaint at the failure of Wilder or his assigns to either drill on Shaw's land or pay the stipulated dollar an acre to prevent a forfeiture of the lease. There is no pretense that Wilder or the Consolidated Progressive Oil Corporation, or any one for either of them, accepted or acted upon any verbal proposition or statement made by Shaw. The presumption is that, whatever verbal proposition Shaw made to Denman was embodied in Shaw's proposition in writing, dated the 16th of May, 1918, which was not accepted or acted upon by Wilder or his assigns within the time specified therein.

The only well that had been drilled on Shaw's land when he leased to plaintiff the E. ½ of N. W. ¼ and the N. E. ¼ of S. W. ¼ of section 30 was drilled on the N. W. ¼ of N. E. ¼ of section 30, not described in the lease now in contest; and it was not a compliance with any obligation under the lease now in contest. There is therefore no merit in the plea of estoppel.

The judgment appealed from is affirmed, at appellant's cost.