**(85 South. 59)**

**No. 23878.**

**WILDER v. NORMAN et al.**

(April 5, 1920. On Application for Rehearing, June 2, 1920.)

*(Syllabus by the Court.)*

1. **Mines and minerals** ⬤═➤73—**Lease predicated on suspensive potestative condition as to lessee not enforceable by him.**

A supposed oil and gas lease, predicated upon a suspensive potestative condition, as to the lessee, cannot be enforced by him.

2. **Mines and minerals** ⬤═➤78(2)—**Lessee, by failing to drill well or to make payment, held to forfeit all his rights.**

Where a supposed oil and gas lease purports to bind the lessee to drill a well upon the land of the lessor within a certain period, and provides that, "failing so to do, all of his rights hereunder shall cease and determine," and further provides that he may prevent the forfeiture of the lease at the expiration of such period by making a certain payment, and where, in such case, the lessee fails to drill the well, or to make the payment, prior to the expiration of the period so fixed, or as extended on the same conditions, the lease becomes ipso facto forfeited, in accordance with its terms, and the lessee loses all of his rights thereunder. He cannot prevent the forfeiture after it has occurred.

*(Syllabus by Editorial Staff.)*

On Application for Rehearing.

3. **Mines and minerals** ⬤═➤79(6) — **Failure to make timely payment preventing forfeiture of lease results in forfeiture.**

If a certain payment is to be made on or before a certain fixed date to prevent a forfeiture of an oil and gas lease, and the payment is not made on or before such date, a forfeiture results.

Appeal from Third Judicial District Court, Parish of Claiborne; J. E. Reynolds, Judge.

Eleven separate suits by Mrs. Bennie H. Wilder against F. C. Norman and others, and against ten other separate parties defendant. Cases consolidated by consent, and judgments for defendants, and plaintiff appeals. Affirmed.

Barnette & Blanchard and Wilkinson, Lewis & Wilkinson, all of Shreveport, for appellant.

Blanchard, Goldstein & Walker, of Shreveport, for appellees White Bros., Louisiana Oil Refining Corp., Norman, Henry and J. A. Merritt, Camp, and Yancy.

D. Edward Greer, of Houston, Tex., and Thigpen & Herold, of Shreveport (R. L. Batts, of Pittsburgh, Pa., of counsel), for appellee Gulf Refining Co. of Louisana.

Hampden Story, of Shreveport, for appellees Texas Co., Seals, H. C. Merritt, and McKenzie.

Bell & Clark, of Shreveport, for appellees Tooke and others.

Statement of the Case.

MONROE, C. J. Plaintiff, as the transferee from A. E. Wilder (her husband) of certain oil and gas leases (all entered into in

October or November of 1916), brought these suits against Wilder's lessors and other persons and corporations claiming under them by virtue of subsequent leases, praying, in each case, that she have "judgment recognizing her said mineral rights in such property and placing her in possession thereof, and that the claims of [naming the particular defendants] as to a mineral lease on said property be canceled and annulled." The petitions being framed in identical terms (save as to the names of the defendants), and the defenses being the same (save that some of the defendants filed exceptions of no cause and no right of action), the cases were, by consent, consolidated, and as to the facts were tried and decided upon evidence consisting of the leases to A. E. Wilder and extensions and assignments thereof, subsequent leases by his lessors, an agreement in writing as to certain of the facts, and some oral testimony. Counsel for plaintiff and defendants alike treat the leases to Wilder as identical in terms, save that plaintiff's counsel point out a difference between a certain section of the leases from Chapman, J. A. Merritt, and H. C. Merritt, and those from the other nine lessors, which difference we shall again refer to. Summarizing the provisions of the leases which bear upon the issues here presented, and, for convenience of expression, referring to them as a single contract, we find that:

By paragraph 1, the lessee binds himself to commence operations for drilling a well, or wells, on the leased premises, "or on other leased premises," which he expects to acquire, within five miles of Homer, La., within six months, and to prosecute the work with diligence until the well is drilled to a depth of 2,600 feet, unless oil or gas are sooner found in paying quantities, "and failing to do so, all his rights hereunder shall cease and determine."

By paragraph 2, it is declared that the land which is the subject of the contract is in unproven territory, and that it is contemplated that the lessee will lease other lands within five miles of Homer under similar contracts; that on the completion of the first well, as provided in paragraph 1, he shall within one year begin operations for drilling a well on the land "herein described," and shall prosecute the drilling to a depth of 2,600 feet, unless oil or gas is sooner found in paying quantities, "and, failing to do so, all his rights hereunder shall cease and determine."

Paragraph 6 (in nine out of the twelve original leases) reads as follows:

"Sixth. It is especially understood and agreed that the said lessee may prevent the forfeiture of this lease at the expiration of the said one-year period, as provided in paragraphs 2 and 3, on paying to the lessor the sum of $1 per acre, and thereupon the said lease, with all of the rights hereunder, shall be extended for a period of one year from the expiration of said one year, with all the rights and privileges and subject to all the conditions herein specified, and may so extend said lease for a period of three years on the payment of said sum per acre annually in advance, which may be made to lessor direct or deposited to lessor's credit in Homer National Bank of Homer, La."

In the remaining three leases (from Chapman, J. A. Merritt, and H. C. Merritt), the words "in advance" (as they appear at the end of the fourth line from the bottom of paragraph 6 above quoted) are omitted. In other respects the language used in the paragraphs, respectively, is the same. To each of the contracts there was added during the month of May, 1918, the following, signed by the respective lessors, but not by Wilder, or any assignee of his, to wit:

"I [name of lessor], the within lessor, do hereby consent and agree that the time for paying the $1 per acre, as expressed in the second line of paragraph 6 of the within lease, be and the same is hereby extended to January 1, 1919, and all other provisions of the within lease shall be and remain unchanged."

The written admissions to which we have referred read:

"In each of the above cases it is admitted that the Atlas Oil Company, the assignee of a portion of the leases taken by A. E. Wilder in the vicinity of Homer, La., commenced the operations for the drilling of a well within said five-mile area within the time stipulated in the leases, and completed the same in March, 1917, to the depth of more than 2,600 feet, and the same was a dry hole and was abandoned as such; that later, some time in the year 1918, the Consolidated Progressive Oil Corporation, also the assignee of a portion of the mineral leases taken by A. E. Wilder in the five-mile area around Homer, commenced operations for drilling the Featherstone No. 1 well, and later, during the year 1918, commenced the operations for drilling the Featherstone No. 2; that both of those wells showed oil and gas, but not in paying quantities; that along about October, 1918, the Consolidated Progressive Oil Corporation commenced operations for drilling what is known as 'Shaw No. 1,' within the five-mile area referred to, and completed the same as a producing well on January 14, 1919; that none of the wells referred to above were drilled on any of the property referred to in any of the leases filed in evidence in this case, but were drilled on other property in the five-mile area.

"It is also admitted that A. E. Wilder, under authority of the Consolidated Progressive Oil Corporation, on January 1, 1919, drew on the Consolidated Progressive Oil Corporation checks or drafts for the amounts specified as rentals in the leases, that is, $1 per acre, and delivered those checks or drafts to the Homer National Bank, which forwarded them for collection to its correspondent in New York; that those drafts were presented for payment on or about the 12th day of January, 1919, and payment of them was refused by the Consolidated Progressive Oil Corporation; later, on January 17, 1919, those drafts were returned to the Homer National Bank at Homer, being received on that date, with the indorsement on each of the drafts that payment had been refused; that on the same day that the drafts were received at the Homer National Bank the Consolidated Progressive Oil Corporation, through its New York bank, wired to the New Orleans correspondent of the Homer National Bank the $1 per acre for the rentals on each acre of the land involved, and that the Homer National Bank was formally notified of this on January 18th.

147 LA.—14

"It is admitted that each of the lessors made party defendant in these cases refused to accept the said sum of $1 per acre, or any part of the same, but this refusal to accept the money was never notified to the bank until about the 16th or 17th of January, 1919, except as to those hereinafter shown by the testimony to have made objection."

The oral testimony adds but little to the admitted facts, save to show that two or three of the lessors, who, perhaps, were to be found in Homer, and with whom there was some communication on the subject, declined to receive any payment from Wilder after January 1st, or, to be more exact, after January 14th, since they had no opportunity to refuse prior to January 15th, no money having been tendered to them or deposited to their credit in the Homer National Bank prior to that date, and, in fact, not then. Mr. Wilder, however, went to the bank on the 15th, which was the day following the coming in of the well "Shaw No. 1," and prior to the return, but subsequent to the dishonor, of his drafts on New York, and requested Mr. McKenzie (probably the cashier) to receive and place to the credit of defendants his checks payable to their orders, respectively, for amounts (probably) covering the acreage called for by their contracts, but, while McKenzie received the checks to be delivered to the payees if called for by them, he declined to receive them as money, or to place them to the credit of the lessors; though he and Wilder testify that the latter had, at that time, sufficient funds to the credit of his account to have met the checks. As a matter of fact, none of the payees called for the checks or accepted them.

## Opinion.

[1, 2] It is obvious from the foregoing statement that Wilder bound himself to nothing in the contract in question, and hence that the other party thereto was not bound. It is true that paragraph 1 of that contract be-

gins with the statement that the lessee binds himself to drill a well within six months on some land within five miles of Homer (though not necessarily the land of the party with whom he was contracting), but the end of the paragraph provides an open door through which, construing the contract as a whole, the lessee readily escapes any obligation which might otherwise result from that statement, since it declares that "failing to do so [i. e., failing to do what he apparently bound himself to do] all of his rights hereunder shall cease and determine." And paragraph 2, which declares that, within one year from the completion of the first well (not a paying well, but merely the "first well"), he shall "begin operations for drilling a well on the said land herein described and prosecute the same," etc., concludes in the same way, to wit, "and failing to do so, all of his rights hereunder shall cease and determine."

When, therefore, he allowed one year to elapse after the Atlas Oil Company (Wilder's assignee) had completed and abandoned the dry well within the five-mile area without commencing operations for the drilling of a well on the land described in his contract with defendants, and failed to pay to his lessor $1 per acre for an extension of time, his interest in that contract ceased and became forfeited, as provided by paragraphs 2 and 6, and there was no longer any contract, and no longer even the semblance of an obligation on his part, since he had suffered the penalty agreed on by the other contracting party for failing to do that which, subject to that penalty alone, in the event of his failure, he had agreed to do.

In May, following, however, his lessors each wrote upon his particular contract his consent "that the time for paying the $1 per acre as expressed in the second line of paragraph 6 * * * be * * * extended to January 1, 1919, and all provisions of the written lease shall be and remain unchanged." But that consent was purely voluntary and gratuitous, and does not purport to impose any obligation, reciprocal or otherwise, on the lessee. Conceding to it all the effect that may have been intended, the most that can be said is that it reinvested a contract that was originally unenforceable, because based, as to one of the parties, on a suspensive, potestative condition, with only the vitality that it was supposed originally to have possessed; and according to the terms of that contract the lessee was to have drilled a well on the lessor's land prior to March (say 27), 1918, under penalty, in the event of his failure so to do, of forfeiture of all of his rights therein, and he failed to drill the well. The lessors then, without receiving any consideration or requiring the lessee to assume any obligation to drill the well, consented that the matter should be opened, and the day for the becoming effective of the forfeiture resurrected from the past and re-established in the future; but subject (mutatis mutandis) to the same conditions, to wit, that if the lessee should allow one year plus nine months (instead of the original one year) to elapse between the completion of the first well and the commencement of drilling operations on the land described in the contract he should, as originally provided, lose all his rights in the contract, and should not be allowed to "prevent" that catastrophe by the payment of the $1 per acre, etc. In other words, as a catastrophe cannot be prevented after it has happened, the plain meaning of paragraph 6 is that the payment therein provided for shall be made before the happening. The lessee, however, not only did not drill the well, or make the payment before the happening, but by his draft on New York, drawn, it is said, with the consent of the drawee, and the refusal of the drawee to pay it, he seems to have practically abandoned the idea of going on under the extensions and to have been merely playing for time, by way of speculation, at the expense of those by whose indulgence the extensions had been granted.

And even after the sudden change in the situation by the bringing in of the well "Shaw No. 1" on January 14th, and his discovery, on January 15th, that he had money to his credit in the bank in Homer where the $1 an acre should have been paid on January 1st, and after the wiring of the money from New York on January 17th, by the drawee of the draft which it had refused to pay and had returned, neither of those parties seemed to recall the adage (paraphrased) that it requires a pound to cure that which an ounce might have prevented. Hence for leases in a proven oil field they offered only the price for which the lessors had consented to grant them when in wildcat territory, and others stepped in and took them at something more nearly approximating their real values.

We fail to find that the omission of the words "in advance" in the closing lines of paragraph 6 of the leases by Chapman and the two Merritts operates any change in the meaning of those leases, as compared with the others; that meaning, we think, having been made sufficiently definite, for the purposes of these cases, by the provisions of paragraphs 2 and 3 and the earlier provisions of paragraph 6.

The law applicable to the questions here presented has been so frequently considered in and settled by the decisions of this court and others that it need not be here further discussed. Escoubas v. La. P. & O. Co., 22 La. Ann. 280: Jennings-Heywood Oil Co. v. Houssiere-Latreille Oil Co., 119 La. 853, 854, 44 South. 481; Murray v. Barnhart, 117 La. 1026, 42 South. 489; Gray v. Spring, 129 La. 360, Ann. Cas. 1913B, 372;[1] Goodson v. Vivian Oil Co., 129 La. 958, 57 South. 281; Berl v. Kehoe, 130 La. 1020, 58 South. 864; Long v. Sun Co., 132 La. 601, 61 South. 684; Pure Oil Co. v. Gulf Co., 143 La. 284, 78 South. 560; C. C. 2034.

---

[1] 56 South. 305.

The judgments appealed from are therefore affirmed, at the cost of the appellant.

## On Application for Rehearing.

PER CURIAM. [3] The learned counsel for plaintiff interpret the decision of the court in this case as precluding oil and gas leases such as are commonly known as community leases, by which the consideration of the contract is to be a well to be put down on land other than that leased. Such is not the doctrine of the decision; but the doctrine is that if a certain payment is to be made on or before a certain fixed date for preventing the forfeiture of an oil and gas lease, and the payment is not made on or before such date, the forfeiture takes place. Rehearing refused.