## TAYLOR et al. v. STANLEY et al.

(District Court, W. D. Louisiana, Lake Charles Division. January 7, 1925.)

No. 213.

**1. Mines and minerals ⟺78(1)—Lease requiring commencement of new oil well within 60 days of completion of well construed.**

Mineral lease, requiring lessee to commence new well within 60 days of completion or abandonment of well, *held* to mean that well should become paying oil producer or be failure before commencement of new one was required, but fact that well subsequently failed to produce in paying quantities, notwithstanding further work to restore it or prove its failure, would not necessarily mean that it had not been completed.

**2. Mines and minerals ⟺78(1)—Time held of essence of mineral lease, and court cannot substitute its judgment for parties' measure of diligence.**

Time is of essence of mineral lease, requiring lessee to drill wells within specified period, and court cannot substitute its own judgment as to. what is reasonable, where parties themselves have provided measure of diligence.

**3. Mines and minerals ⟺78(1)—Oil well held not "completed," within terms of lease.**

Oil well, which started as gusher, but immediately sanded up and spouted mud and water, and was bailed and pumped until it produced 60 barrels per day and then declined, necessitating sidetracking and redrilling, *held* not "completed," within requirement of lease that new well be commenced within 60 days of completion of well, notwithstanding well had been reported as completed to department of conservation of Louisiana, and drilling machinery removed.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Complete—Completion.]

In Equity. Suit by Mary Taylor and another against N. G. Stanley and another. Decree for defendants.

McCoy & Moss, of Lake Charles, La., for plaintiffs.

W. D. Gordon and L. J. Benckenstein, both of Beaumont, Tex., C. R. Cline, of Lake Charles, La., and O. S. Parker, of Beaumont, Tex., for defendants.

DAWKINS, District Judge. This is a suit to have declared forfeited under its terms a certain mineral lease upon a portion of a 10-acre tract of land situated in Calcasieu parish. The claim of forfeiture is based upon the contention that the Vinton Petroleum Company, as assignee of the said lease, failed to comply with its essential stipulations for development of the property; that by express provisions thereof all rights to or in the undeveloped portions of the land have been lost, and the property has

reverted back to plaintiffs, free from said lease.

Defendant denied the facts alleged as the basis for forfeiture, and alternatively pleaded acquiescence and estoppel upon the part of plaintiffs. The clauses of the lease to be interpreted under the facts developed on the trial are as follows:

"This lease is made for the purpose of drilling sinking of wells, mines, or other excavations for the purpose of prospecting for oil, gas, sulphur, salt, or other valuable mineral deposits beneath the surface of the above-described property, and for the purpose of producing oil, gas, sulphur, salt, or other valuable mineral deposits on the above-described land. The party of the second part binds and obligates himself, his heirs, sublessees, vendees, or assigns, to erect a derrick and commence the actual drilling of a well for the purpose of prospecting, or to erect a derrick and commence the actual deepening of a well already sunk upon said premises, within 30 days from the execution of this lease, and to prosecute said operations with due diligence and continuously until he shall have developed a stratum of oil, gas, sulphur, salt, or other mineral deposit in paying quantities, making due allowance for unavoidable accidents or delays over which the said second party has no control, or until he has reached such a depth as to satisfy him that no such deposits exist beneath the surface of said land.

"It is further expressly agreed and understood, and is one of the considerations of this contract, that, should the party of the second part discover oil, gas, sulphur, salt, or other mineral deposits beneath the surface of said land in paying quantities, that the said party of the second part shall develop same and produce said deposits therefrom continuously, as long as said deposits are found to exist (unavoidable accidents and delays over which he has no control excepted), and in the event he shall fail, neglect, or refuse to proceed to develop same with due diligence, or to continuously produce and extract such deposits therefrom, then and in that event this contract shall ipso facto become null and void and of no force or effect. * * * It is one of the considerations for this lease that, when the first well is finished by the party of the second part under the terms of this contract, either by the discovery and development of a stratum of oil, gas, sulphur, salt, or other mineral deposits in paying quantities, or by boring to such depth as to satisfy him that no such deposits exist at that point, the said second party shall, within 60 days aft-

er the completion or abandonment of said well, begin the sinking of a second well for prospecting purposes upon said land, and prosecute said operations continuously and diligently until he shall have developed a stratum of oil, gas, sulphur, salt, or other mineral deposit in paying quantities, making due allowance for accidents and unavoidable delays over which the said second party has no control, until he has reached such a depth as to satisfy him that no such deposits exist at such point, and upon the completion or abandonment of said second well he shall, within 60 days thereafter, commence the sinking of another well, and continue the drilling of additional wells with an intermission of not to exceed 60 days between the completion or abandonment of one well and the commencement of another well, until they have sunk at least one well upon each of the above-described lots.

"* * * In the event of failure on the part of the party of the second part, his vendees, lessees or assigns, to comply with the foregoing paragraph, such failure shall ipso facto forfeit all rights herein granted except upon such lot or lots as there exists at the time of said forfeiture wells producing oil, gas, sulphur, salt, or other mineral in paying quantities, except that the party of the second part shall have the right of ingress and egress to and from said lots so forfeited for a period of 30 days, to remove the salvage from the abandoned wells which he or his vendees and sublessees or assigns may have sunk upon the lots so forfeited."

[1] The facts as disclosed by the record, in substance, are that the lease in question was made with the defendant N. G. Stanley October 15, 1914, and on April 28, 1924, was assigned to the other defendant, Vinton Petroleum Company. In the intervening period of 10 years about 10 wells were drilled upon the property. However, on objection made by defendants and acquiesced in by plaintiffs at the trial, it was conceded that the lease had been complied with by the vendors of the Vinton Petroleum Company prior to its acquisition on April 28, 1924, and the court has been afforded no information as to why, in view of the strict terms of the lease requiring development, only an average of one well per year was drilled during that time. After taking over the property, the Vinton Petroleum Company commenced drilling upon one of the lots, known as No. 116, early in June, and about July 10th, struck an oil sand, which for a few hours made an estimated flow of 3,000 barrels per day. However, within a few hours it began to spout mud and water, and defendant adopted the customary means to restore it, such as locating and closing the break or opening into the pipe through which it was believed the mud and water were flowing.

As a result of these efforts, approximately on the 15th of July the well developed into a small pumper, the drilling machinery was moved off the lease, and a standard rig for pumping was placed and the well connected up, with an initial production of about 60 barrels per day. It was then turned over to the production foreman, along with other producing wells of defendant, and a report was made to the conservation department of Louisiana that the well had been completed on July 10th. Thereafter it was pumped, the flow of oil gradually decreasing, until at the expiration of 10 or 12 days the foreman found it necessary to again bail, and this alternate bailing and pumping from time to time was continued until October 8, 1924, when the drilling rig was moved back, and efforts commenced, as the production foreman termed it, to "work over" the well. Thus a period of 83 days from July 17th to October 8th had elapsed from the time of removing to the date of returning the drilling machinery to the premises. Hence it is seen that if, within the meaning of the clauses of the lease above quoted, the well was, at the time of such removal, completed, then the right to develop the remaining lots was lost, because more than 60 days had elapsed without defendant beginning work upon another well.

I may say here that, while extensive allegations were made of matters of conduct by plaintiff and acquiescence in the manner of developing the property, defendant failed to offer any proof to sustain them. In the early stages of presenting the defense, counsel started to offer such proof, but, upon suggestion from the court, desisted until the direct evidence bearing upon completion of the well and forfeiture had been submitted; but the case was closed without any further effort to show estoppel. The only circumstance having any bearing upon the plea of estoppel is the fact that, as to defendants' predecessor, a period of 10 years was consumed in drilling as many wells; but it was agreed that the lease had been complied with during that time, and I am no more justified in concluding that this was the result of acquiescence in a course of conduct not within the letter of the contract than any other cause. Besides, this took place as between the plaintiffs and other persons, and

it can hardly be said as a matter of legal principle that the Vinton Petroleum Company, the subsequent vendee, would be accorded any such indulgence, if such had existed, as that which had been shown the original lessee. It is true, the drilling of the well No. 13 required only about a month and a half, or say 45 days, and that a number of tests had been made south and east of the unexplored lots of the lease; but these circumstances alone could not have the effect of overcoming the clear requirements of the contract that not more than 60 days should elapse from the completion of any well before the commencement of another until each lot had been drilled.

Returning, again, to the question of when, if at all, well No. 13 was completed, within the provisions of the lease, I am of the opinion that what the parties had in mind was when the well should reach such a stage and condition that it could be considered as a paying oil producer or a failure within the known strata of the field. The fact that through accident or otherwise it subsequently was spoiled, or failed to produce in paying quantities, notwithstanding further work to restore or to prove its failure, would not mean necessarily that it had not been completed.

[2] Contracts for developing land for oil and gas undoubtedly fall in a class of their own, requiring the application of principles necessary to meet the nature of the business, if justice is to be done. Brown v. Wilson, 58 Okl. 392, 160 P. 94, L. R. A. 1917B, 1184; Chauvenet v. Person, 217 Pa. 464, 66 A. 855, 11 L. R. A. (N. S.) 417. As has often been said, time is of the essence of such agreements, and courts cannot substitute their own judgment as to what is reasonable, where the parties themselves have provided the measure of diligence. Woodley et al. v. Hollingsworth, 154 La. 686, 98 So. 87; Texala Oil & Gas Company v. Caddo Mineral Lands Co., 152 La. 549, 93 So. 788; Talley v. Lawhon, 150 La. 25, 90 So. 427; Wilder v. Norman et al., 147 La. 413, 85 So. 59. Nevertheless the controlling purpose of all such contracts is the production of oil in paying quantities, or a reasonable exploration of the property to test its possibilities.

[3] In this instance the lease goes much further than in the average case, by not only requiring almost continuous efforts on the part of the lessee, in that not more than 60 days should elapse after the completion of one well before another was commenced, but it was further stipulated that on this small tract of 10 acres work should be kept up until at least one well had been drilled on all of the lots, consisting of one acre each; otherwise, the rights upon those unexplored should be ipso facto lost by the lapsing of the stipulated time. The vital question to be determined, therefore, is: Did what was done, as outlined above, amount to a completion either of a producing oil well or a dry hole within the fair intendment of the contract? Strange to say, there appear to be few cases on the subject; none have been cited in the able briefs submitted by both sides, and I have found but two decisions bearing directly on the point. It would seem that an issue of such importance must have arisen many times in the history of the oil industry of this country.

I think it can hardly be said that, when the oil sand was reached and the well flowed for two or three hours as a gusher of approximately 3,000 barrels per day, and then suddenly choked up, producing mud and water, it was completed as a paying oil well. Neither can I conceive that any one would have abandoned it as a failure with such apparent rich possibilities. Therefore the only sensible course which any one could have pursued was to endeavor to restore it to the large production with which it had started, especially since it is shown and was known that in the immediate locality many wells had been found to produce large quantities of oil for considerable periods. Hence defendant did that very thing; i. e., attempted to reclaim it. After some 8 or 10 days it succeeded in shutting off the flow of mud and water, presumably sealed the break in the pipe through which they flowed, and by bailing and pumping cleaned the hole to such extent that the well again commenced producing oil as a pumper at the rate of about 60 barrels per day. Defendant then connected it up with what is known as a standard rig for pumping, but with instructions to the producing foreman to continue efforts to increase its output. But, instead, the quantity of oil promptly decreased, and at the end of 10 or 12 days had declined to where it was not a paying proposition. Nevertheless the defendant's efforts in that direction were constantly kept up, not with the ordinary drilling machinery and employees engaged in drilling wells, but by the production department, to whom it had been turned over. Finally, on the eighty-fourth day after removing the drilling machinery, it was moved back; the well was "sidetracked" as it is termed in oil parlance. Work continued after filing of this suit, but the

oil sand was missed entirely, a thing not at all unusual in this field.

It is true that, according to a number of expert witnesses sworn on behalf of the plaintiff, when an oil sand is struck, the drilling machinery removed, a standard rig is set up, the well producing as much as 60 barrels per day, and is turned over to the production foreman, within the opinion of experienced oil men, the well is considered complete; but both they and the witnesses for the defendant, when given the additional facts of this case—that is, that a well had started as a gusher, immediately sanded up and spouted mud and water, was then bailed and pumped to the point where it produced oil as a small pumper, within a few days commenced to decline, until it finally developed into an unprofitable venture— each and all declared that the only reasonable, sensible thing was to pursue the course followed by defendant: First, endeavor to clean out and restore the well; and, secondly, to sidetrack and drill again. There appears to be no dispute, but that defendant reasonably and fairly continued its efforts to make the hole a paying oil well. And there can be no doubting of the fact that, considering the meaning of the term in the sense contemplated by the parties in entering into the contract, it had not and did not become a well producing oil in paying quantities.

Neither do I think that it could be said to have been a failure, or dry hole, until reasonably sufficient tests had been made including the usual course of sidetracking and trying to find the sand in another hole. The circumstances that the defendant reported the well to the department of conservation as completed on July 10th, moved its drilling machinery off, and turned it over to the production foreman are, of course, very significant as indicating what it thought the facts to be; but, granting even that every one thought it a completed, producing well at that time, I do not believe this would be conclusive, when we revert back to the primary purpose of both parties in entering into the contract, and that was to have each hole produce oil in the largest possible quantities. Certainly all reasonably necessary efforts should have been made to that end. The nature and extent of those efforts were, by the terms of the contract quoted above, left to the discretion of the defendant, and there is not the slightest suggestion of fraud or bad faith on its part. Of course, issues such as this require that each case shall be determined upon its own peculiar facts. As indicated hereinabove, it would be entirely possible to complete a well within the reasonable meaning of that term, and then have it spoiled by some unexpected catastrophe; but in no event do I think that it could be said to be completed when it had not produced oil in paying quantities in the sense and to the extent shown by the facts in this case.

My conclusion is that, at the time of filing this suit, well No. 13 on lot 116 of the lease had not been completed within the meaning of the contract, either as a paying oil well, or as a dry hole, and that there is therefore no sufficient basis to declare the lease forfeited upon the remaining lots. Uncle Sam Oil Company v. Richards, 76 Okl. 277, 184 P. 575; California Well Drilling Company v. California Midway Oil Co., 178 Cal. 337, 177 P. 852.

For the reasons stated, the demand of plaintiffs is rejected, at their costs.